OCT 10 2025 PM 1:35
FILED-USDC-CT-NEW HAVEN

# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

**CHRISTOPHER AMBROSE,**
**Plaintiff**

Case No. 3:25-cv-01372    SVN

v.

**TINA SWITHIN,**
**Defendant**

JURY TRIAL DEMANDED

### NOTICE OF AMENDMENT PURSUANT TO FED. R. CIV. P. 15(a)(1)(A)

Plaintiff files this First Amended Complaint as a matter of course under Rule 15(a)(1)(A) of the Federal Rules of Civil Procedure. Because Defendant has not yet been served with the original Complaint and has not filed a responsive pleading or Rule 12 motion, Plaintiff is entitled to amend without leave of Court.

### FIRST AMENDED COMPLAINT

### I. PARTIES AND JURISDICTION

1. The Plaintiff, Christopher Ambrose ("Plaintiff" or "Ambrose"), is an individual domiciled in Madison, Connecticut.

2. The Defendant, Tina Swithin ("Defendant" or "Swithin"), is an individual domiciled in San Luis Obispo, California.

3. The amount in controversy exceeds $75,000, exclusive of interest and costs.

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a), as the parties are citizens of different states and the jurisdictional amount is satisfied.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because Defendant

deliberately and maliciously targeted Plaintiff in Connecticut, and the events giving rise

to the claims and the resulting injuries occurred in this District, as Defendant knew and

intended.

## II. INTRODUCTION

6.    This is a civil action seeking damages for defamation, defamation *per se*, false light

invasion of privacy, public disclosure of private facts, intentional infliction of emotional

distress, and harassment under Connecticut law, arising from false and malicious

statements Defendant published online concerning Plaintiff.

7.    Since the initial filing of this action, Defendant has escalated her defamatory campaign

against Plaintiff, warranting an increase in the damages sought to reflect the aggravated

and continuing harm caused by her conduct.

8.    Defendant, Tina Swithin, holds herself out to the public as a "family court expert" and

"divorce coach," yet she does not identify any recognized educational or professional

qualifications supporting those claims. She routinely portrays herself as an authority on

family-court issues while promoting conspiracy theories about the legal system.

9.    Defendant regularly targets and disparages family-court participants— judges, attorneys,

guardians ad litem, and particularly fathers—depicting the courts as corrupt and

incompetent on her Instagram and FaceBook accounts and on her sensationalized blog,

*One Mom's Battle*. She describes the blog as part of a "global movement" that she claims reaches more than 250,000 followers.

10. In September 2023, Swithin published an online article falsely accusing Plaintiff of heinous acts, including: sexually, emotionally, and verbally abusing his children; isolating them from family and friends; conspiring with courts, the guardian ad litem, custody evaluator and others to unlawfully gain custody; lying under oath; and abusing and stalking his ex-wife, Karen Riordan ("Riordan"), who on information and belief was Swithin's paying client.

11. Defendant Tina Swithin's article directly echoed the discredited narrative that Karen Riordan had advanced for years through an online smear campaign against Plaintiff. Subpoenaed phone records confirm that Defendant Swithin and Riordan communicated prior to publication, demonstrating coordination and Swithin's awareness of the source and nature of Riordan's false claims.

12. Defendant's article also reflects her knowledge that multiple Connecticut authorities— including the Superior Court, local law enforcement, hospitals, and the Department of Children and Families ("DCF")—had investigated and found Riordan's abuse allegations to be false. Defendant further knew that, based on Riordan's alarming conduct, multiple courts had denied her physical and legal custody and prohibited even supervised visitation unless she underwent a psychiatric evaluation and entered intensive therapy.

13. Defendant was also aware that Riordan had failed to comply with these court-ordered conditions, had voluntarily relocated to Florida, and had chosen not to lawfully see the children.

14. Defendant's article further reveals her awareness that, because of Riordan's ongoing custodial interference, the Connecticut court had entered restraining orders protecting the children after multi-day evidentiary hearings, and that Riordan faced criminal contempt charges for violating those orders.

15. Despite knowing these facts, Defendant deliberately disregarded them and chose to republish Riordan's false narrative as truth. Defendant's decision to ignore readily available public records, judicial findings, and firsthand information evidencing the falsity of Riordan's claims demonstrates actual malice—a reckless disregard for the truth and a willful intent to defame Plaintiff.

16. Having full knowledge that Riordan's allegations had been repeatedly investigated and rejected by Connecticut authorities, and that multiple courts had found Riordan's conduct —*not Plaintiff's*—to be abusive and harmful to the children, Defendant Swithin nevertheless chose to republish those falsehoods to a national audience. In doing so, she adopted and amplified Riordan's discredited narrative, presenting it as factual truth and as a case study of alleged judicial corruption and child endangerment.

17. Defendant's publication incorporated Riordan's known false statements, and portrayed Plaintiff as an sexually and emotionally abusive and manipulative father who had escaped accountability through court collusion.

18. Defendant's article also repeated the defamatory statements of discredited psychiatrist Bandy Lee, identifying her as "a world-renowned expert on violence". In fact, as widely reported in the mainstream media, Lee had been terminated from her position when physician colleagues became alarmed at her lack of medical knowledge and professional ethics.

19. The article's false and sensational claims, coupled with Lee's medical credentials and Defendant's reputation as a self-described "advocate for protective mothers," ensured that these statements would be widely disseminated and credited as truthful by her large online following who was predisposed to accepting her narratives.

20. Despite the availability of court decisions—which were publicly accessible and widely reported in the Connecticut court record—Defendant Swithin either knew or recklessly disregarded these judicial determinations when she republished Riordan's discredited allegations as fact.

21. On July 10, 2025, Plaintiff sent Defendant a detailed cease-and-desist letter identifying specific statements in her publication as false, defamatory, and grossly misleading. Plaintiff informed Defendant that her article had subjected him to public hatred, contempt, and ridicule, causing substantial reputational injury and severe personal

distress. He enclosed two official Connecticut court documents, including the 40-page

divorce decree (Connecticut Superior Court Docket No. NNH-FA-19-6150042-S, Entry

#520.10, Memorandum of Decision (Adelman, J.) "The Decision" at p. 37), which left no

ambiguity as to the falsity of the narrative Swithin had republished.

22. The Decision comprehensively detailed Riordan's extensive misconduct—repeated

perjury, manipulation, destruction and misuse of evidence, and a long-standing pattern of

recruiting third parties to intimidate witnesses and make false reports of child sexual

abuse against Plaintiff. ***The Court explicitly found that Riordan had coached the***

***children to fabricate allegations of abuse and to destroy evidence of her directives.***

23. The Decision made clear that every accusation advanced by Riordan—and restated by

Defendant—had been exhaustively investigated by law enforcement, child-protective

services, and medical professionals and found to be baseless.

24. The Court awarded Plaintiff sole legal and physical custody of the parties' three children

and denied Riordan even supervised visitation unless she first completed a full

psychiatric evaluation and intensive, court-ordered treatment aimed at "eliminating the

defendant's behaviors that have had a negative impact on the minor children and their

relationship with the plaintiff" (The Decision at p. 37). Riordan refused to comply and

instead chose to abandon contact with the children.

25. After receiving Plaintiff's cease-and-desist letter and the accompanying court documents, Defendant removed the article but refused to issue any retraction, correction, or acknowledgment of falsity.

26. Instead, she sought to justify her publication and threatened to "update" and republish the same defamatory narrative, including a purported "interview" with Plaintiff's minor daughter—despite being on notice from the court records provided that the child had been found to be highly susceptible to Riordan's coercive influence and manipulation.

27. Defendant's stated intent to further exploit the child's vulnerability for publication, in the face of overwhelming judicial findings and documentary proof of falsity, evinces a deliberate and malicious disregard for truth, decency, and the welfare of the minor child. Such conduct underscores that Defendant's purpose was not to inform the public or advocate for children, but to perpetuate and amplify a knowingly false and injurious narrative aimed at destroying Plaintiff's reputation and gaining publicity for herself.

28. On July 17, 2025, Plaintiff reminded Defendant via email that she had yet to inform her 250,000 followers and the rest of the internet that her vicious, life-destroying published statements claiming he was a child sex predator were false. She responded by email stating she "consider[ed] the matter closed."

29. Defendant Swithin has sought to cultivate online notoriety and personal "clout" through the publication of sensational, salacious and defamatory material, including her false and reckless statements about Plaintiff. Her conduct was not negligent or careless—it was

intentional, malicious, and calculated to defame Plaintiff, invade his privacy, cast him in a false light, and inflict severe emotional and psychological harm.

30. By republishing accusations she knew to be false, disregarding official judicial findings to the contrary, and threatening further defamatory content even after being placed on notice, Defendant acted with actual malice and in conscious disregard of the truth. Her ongoing actions have caused further irreparable harm to Plaintiff's reputation, personal and professional standing, and the well-being of his children, for whom she purports to be an advocate.

31. Defendant's continuing misconduct even after being alerted to the extreme harm she is inflicting warrants the full intervention of this Court and the imposition of additional substantial compensatory and punitive damages to redress and deter such egregious defamation.

### III. STATEMENT OF FACTS

32. Plaintiff Christopher Ambrose ("Ambrose") and non-party Karen Riordan ("Riordan") were married in June 2004. Following their marriage, they resided in New York City before relocating to Los Angeles, where Ambrose had secured a new position as a television writer and producer.

33. Riordan, a teacher by training, left her employment immediately after the wedding. While in Los Angeles, she worked part-time as a tutor in a position arranged by one of Ambrose's colleagues. Apart from this part-time position, Riordan remained unemployed

throughout the marriage, including for the three years prior to the couple's decision to have children.

34. Both Ambrose and Riordan had professional experience working with at-risk youth, and they chose to build their family through adoption. In 2007, the couple adopted two infants from Guatemala, a daughter and a son, and later adopted a newborn son from Utah. These three children are collectively referred to herein as "the children."

35. The parties agreed that Ambrose would continue as the family's sole financial provider and that Riordan would remain at home as the children's primary caregiver.

36. Ambrose was a consistently involved and devoted father, rarely missing the children's events or activities. He frequently attended little league games, gymnastics events, and parent–teacher conferences alone. He also accompanied the children to medical appointments, including his daughter's quarterly full-day audiological assessments in New York, which Riordan attended only twice in four years.

37. Though a "stay-at-home-mom," Riordan, by contrast, frequently missed the children's practices and games, and she developed a documented pattern of conflict with medical and educational professionals. The parties' divorce decision expressly found that Riordan "had a need to challenge and create conflicts," including with pediatricians, teachers, school administrators, and even the entire Westport Board of Education. (The Decision at 11).

38.  During these years, Riordan also began maligning Ambrose to the children, both subtly and overtly. This behavior escalated into a disturbing pattern, such as excluding him from family outings and holiday gatherings. (The Decision at 6–25).

39.  Therapists who treated the older children—each chosen by Riordan—reported that the children consistently described Ambrose as an attentive and loving father. Those therapists also documented Riordan's deliberate efforts to undermine the children's relationship with their father and to turn them against him.

40.  After multiple unsuccessful attempts at counseling, the couple agreed that the marriage was irretrievably broken. In July 2019, Ambrose filed for divorce, seeking shared custody and an equitable financial division. Riordan did not respond to the filing.

41.  Instead, without notice to Ambrose, she removed the children from the marital residence and concealed their location, replacing their phones to prevent him from contacting or locating them.

42.  After several days, Ambrose located Riordan and the children in Rhode Island and was forced to obtain a court order compelling Riordan to return the children so they could begin the school year.

43.  Riordan demanded, and was granted, exclusive use of the Westport marital residence.

44.  However, shortly thereafter, again without notice, she abandoned the residence and moved the children approximately fifty miles away to New Haven County. She signed an

eighteen-month lease for an expensive waterfront property without informing Ambrose or the Court, placing further strain on the family's finances.

45. Almost immediately after Ambrose filed for divorce, Riordan began making false allegations that he had mistreated the children. When those claims did not gain traction with authorities, she escalated to fabricating more incendiary allegations, including that Ambrose had sexually abused the children.

46. No allegations of any kind had ever been made prior to Ambrose's divorce filing, and Riordan never alleged that she herself was abused. To date, no law enforcement or any other agency has ever indicated that Ambrose was accused of abusing or stalking Riordan, despite Swithin's claims.

47. Given Riordan's erratic conduct and the severity of her false allegations, the Court (Grossman, J.) *sua sponte* ordered the appointment of a Guardian ad Litem ("GAL").

48. As reflected in correspondence between the parties' lawyers, Riordan agreed to the appointment of Attorney Jocelyn Hurwitz, a matrimonial lawyer with over thirty years of experience and widely regarded as among the most capable in the field.

49. The Court ordered that Hurwitz's fees be paid from marital assets, notwithstanding Riordan's later false claim that Ambrose personally paid her and thereby "controlled" her.

50. The Court, again *sua sponte*, also ordered a custody evaluation—an uncommon measure reserved for the most high-conflict cases.

51. Contrary to Riordan's claims, the court record shows that Dr. Jessica Biden Caverly, the custody evaluator, was recommended by Riordan's own attorney. And, as with the GAL, Dr. Caverly's fees were ordered to be paid from marital assets, not by Ambrose individually, contrary to Riordan's subsequent false narrative.

52. There is no record that Riordan ever objected to the appointment of Dr. Robert Horwitz as reunification specialist. Dr. Horwitz—recognized as a leading professional in his field with more than forty-five years of experience—was compensated from marital funds, not by Plaintiff individually. This directly contradicts Defendant's published claim that he was appointed "against Riordan's consent" and paid by Ambrose. That knowingly false statement, combined with the others, misled readers into believing the process was corrupt and controlled by Plaintiff.

53. Around this time, Riordan secretly entered the Westport residence, which she had abandoned, and removed two laptop computers. Initially, she claimed the laptops were used exclusively by Plaintiff. When advised by counsel that stolen evidence could backfire legally, she altered her story and said they were used by the entire family.

54. Riordan then hired a purported forensic expert and paid high five figures for a report alleging that the devices contained "evidence" that Plaintiff had viewed and created pornography and visited fetish sites, including those involving children. In effect, she alleged that Plaintiff stored "kiddie" pornography on laptops his young children supposedly accessed.

55. A subsequent forensic analysis conducted by the former head of the Connecticut State Police Computer Crimes Unit conclusively disproved Riordan's expert's claims. No evidence of child pornography was found—had any existed, Plaintiff would have been arrested. The Court sanctioned Riordan, prohibited duplication of the hard drives, and ordered the laptops returned to Plaintiff. Ambrose declined to initiate separate legal action for these false accusations in order to avoid further escalation.

56. In April 2020— a year before the divorce trial began—the custody evaluator released a report exceeding 100 pages. The guardian ad litem found the information about Riordan so alarming, particularly her relentless efforts to denigrate Plaintiff to the children, that she requested an emergency hearing.

57. The hearing transcripts establish that the Court (Grossman, J.) never "accused Riordan of PA [parental alienation]," as Defendant Swithin falsely claims in her article. Neither Plaintiff nor his counsel raised "the denounced, discredited theory of parental alienation (PA)." Rather, the GAL and custody evaluator testified at length about Riordan's alarmingly erratic behavior and her relentless documented efforts to destroy Plaintiff's relationship with the children.

58. The Court (Grossman, J.), citing Riordan's established pattern of maligning the father to the children and other deeply disturbing conduct, transferred temporary sole legal and physical custody to Plaintiff and imposed a 90-day no-contact order on Riordan to allow time for repair of the father-child bonds she had sought to destroy. The Court noted this

was intended to be a short-term measure to shock Riordan into compliance (The Decision, p. 12).

59. As The Decision further states "the behavior of the defendant was nothing short of horrendous. The defendant never even attempted to follow the court's orders and work toward restoring her former parental role." (The Decision, p. 12).

60. The Court went on to note that Riordan's egregious misconduct "escalated dramatically" after this transfer of custody and included employing hired third parties to file abuse allegations against Plaintiff to the police and DCF. Each allegation was investigated and found baseless.

61. In an effort to de-escalate the conflict and protect the children from additional emotional harm, Ambrose chose not to pursue criminal charges against Riordan despite her repeated false reports of abuse.

62. Riordan also secretly hired a third party to represent herself as same-age peer and communicate horrific and false information about Plaintiff to the daughter, as documented by text messages and therapist statements. (The Decision, pp. 12-18). Defendant Swithin was provided with this information, yet she refused to correct her falsehoods about Plaintiff.

63. Within days of the custodial transfer, Plaintiff discovered that Riordan herself was secretly sending the children dozens of texts, instructing them to falsely report that he

was mistreating them and that they were in great distress. She also directed the children

to delete her messages to avoid detection. (The Decision, p. 12).

64. Following discovery of Riordan's covert texts, the GAL requested another emergency

conference. The Court (Grossman, J.) found that Riordan had continued her pernicious

interference with Plaintiff's relationship with the children, including unlawfully coaching

them to accuse him of abuse.

65. The Court determined that following the 90-day no-contact period, Plaintiff would retain

primary custody and Riordan's visitation would be supervised until she demonstrated an

ability to refrain from coaching the children to turn against their father. (The Decision, p.

12).

66. While grateful for the opportunity to repair his paternal relationship, Plaintiff was

concerned about the psychological impact of the children's sudden loss of their mother.

He wanted them to be able to see Riordan as soon as the 90-day no-contact period ended.

"The plaintiff, the evidence shows, was a very willing participant in the court ordered

process. A supervising agency was retained by him in accordance with the orders. He

completed all the forms and paid the retainer required." (The Decision p. 17). This is one

of many incidents that contradict Defendant Swithin's false claims that Ambrose tried to

keep Riordan from the children. In fact, recognizing the importance of both parents, he

has repeatedly encouraged Riordan to comply with the orders to see the children.

67. But Riordan rejected supervised visitation, "[M]ore difficult to understand, the defendant continuously failed to follow the court order that would allow her to see and be with the children." (The Decision p.17). "The defendant never even did the paperwork required [for supervision]." (The Decision p. 18). In effect, Riordan unilaterally and voluntarily cut off lawful contact with the children after April 24, 2020.

68. The children, confused and distressed by her abrupt absence, exhibited trauma symptoms including anxiety, self-injury, and compulsive eating.

69. All three children told their therapists and the GAL that Plaintiff had not mistreated them or disparaged their mother; to the contrary, he consistently reassured them of her love and reminded them she would see them once she complied with court requirements.

70. The therapists uniformly concluded that the children's emotional struggles were caused by Riordan's abandonment, not by any conduct of their father, contradicting another of Swithin's falsehoods.

71. As during the no-contact period, Riordan maintained clandestine phone and text contact with the children, continuing to tell them—falsely—that Plaintiff was responsible for her absence. She further alleged without basis that Plaintiff had stolen her inheritance, bribed DCF professionals, therapists, and judges, and accused him of sexual deviance, instructing the older children not to leave their younger brother alone with their father because he was supposedly a "gay child molester like Michael Jackson." Defendant Swithin was provided with court documents addressing Riordan's falsehoods.

72.  In December 2020, Riordan sought an *ex parte* emergency temporary restraining order (TRO), again falsely alleging child sexual abuse. She applied in a different jurisdiction under her maiden name to conceal her record of false reports.

73.  The Court (Price-Borland, J.), unaware of her history, initially granted the TROs, leading Riordan to remove the children from their schools mid-day.

74.  Plaintiff's attorney obtained an emergency hearing the next morning. Riordan failed to appear, and the same Court vacated the TROs upon learning of her deception.

75.  Later that day Riordan again failed to appear at an emergency hearing convened by the family court (Grossman, J.).

76.  Police sent to her home found it vacant. Riordan had taken the children to a hotel 25 miles away, where she met her private investigator, Manny Gomez, a former NYPD officer with a long record of domestic violence, strangulation, witness tampering, and other misconduct. Gomez had been terminated for cause by the NYPD and publicly discredited by New York judicial authorities.

77.  Riordan left the children alone with Gomez, who filmed them giving rehearsed statements accusing Plaintiff of sexual abuse.

78.  The Decision notes that Riordan did not understand why it was concerning to others that she would leave three children alone with a violent stranger who had no training to ask them questions about alleged sexual abuse by their father.  (The Decision, p. 18).

79. DCF later confirmed the coercive circumstances of these videos, and every court has barred their admission.

80. After Gomez filmed the children, Riordan took them to Connecticut Children's Medical Center (CCMC) in Hartford and had them repeat their coached accusations. She bypassed the closer Yale New Haven Hospital, where clinicians had previously documented her efforts to manipulate the children's accounts.

81. At CCMC, professionals overheard conversations among the children, including the daughter instructing her brothers about what they were to report, further implicating Riordan. (Again, to spare the children further questioning, Ambrose declined to press charges against Riordan for her false reports).

82. Riordan then left CCMC with the children and returned to the hotel, remaining in hiding.

83. Police ultimately "pinged" her phone to locate her. When they arrived, Riordan initiated a five-hour standoff with two police departments and DCF, while instructing her daughter to livestream the ordeal—a gross violation of the children's privacy.

84. Ultimately, police and DCF, both of whom supported Plaintiff's sole custody, returned the children to him.

85. The following morning, another emergency hearing was scheduled by the GAL. Riordan again failed to appear and refused to speak with the Court (Grossman, J.) by phone.

86. Due to her alarming misconduct and repeated violations of court orders, the Court *sua sponte* transferred the case to the Regional Family Trial Docket ("RFTD"), a specialized division for high-conflict custody cases.

87. Around this time, Riordan began an online smear campaign against Plaintiff. She partnered with Paul Boyne, publisher of the notorious website *familycourtcircus.com*, which is known for anti-Semitic, racist, and homophobic attacks on Connecticut family courts, judges, attorneys, and litigants.

88. In July 2023, Boyne was indicted for cyberstalking and threatening three Connecticut Superior Court judges, all of whom had roles in the Ambrose/Riordan case.

89. During the divorce trial, Riordan insisted under oath she had no connection to Boyne. Subpoenaed phone records, however, revealed *hundreds* of calls between them.

90. Boyne subsequently published the full, 100-plus-page custody evaluation, which had been sealed by the Court (Adelman, J.) to safeguard the children's privacy. This willful and reckless breach of confidentiality—logically initiated by Riordan—publicly exposed the children's most sensitive psychological and medical information and made those records accessible to the children themselves, containing material they were too young and emotionally unprepared to process.

91. Around the same time, a family services evaluation labeled Plaintiff a "high risk" abuser. When the Court learned this was based entirely on Riordan's unsubstantiated claims—

and that neither Plaintiff nor the GAL had even been interviewed—the Court dismissed the finding, as reflected in the trial transcripts.

92. The divorce trial commenced in March 2021 before Judge Gerard Adelman. It spanned 28 days over the course of a year, delayed in part by COVID-19 but "a more significant reason" was "the relentlessly obstructionist tactics of Riordan and her counsel." (The Decision, p. 1).

93. The Court found Riordan's conduct vexatious and manipulative. "Unfortunately this case almost from its start has been one in which the defendant has refused to obey any and all orders from the court." (The Decision, p. 16).

94. Riordan repeatedly refused to provide court-ordered discovery. After lengthy delays, the Court appointed a Discovery Special Master, incurring additional expense, paid with marital funds, solely due to her misconduct.

95. Yet, rather than comply by providing the discovery documents, Riordan claimed both her email account and laptop had been "mysteriously" destroyed. Subpoenaed testimony later confirmed she had purposely deleted her email account and paid a technician to destroy her hard drive.

96. The RFTD Court (Adelman, J.) sanctioned Riordan for perjury and spoliation of evidence.

97. Riordan's record of misconduct during the trial continued, and included, among other things, enlisting third parties to intimidate witnesses—even professionals involved with

the children (The Decision, p. 22). Several of those witnesses later stepped away from the case, citing the harassment.

98. As word spread within the family court community about Riordan's conduct—particularly her pattern of publicly defaming perceived "adversaries" and their families online—it became increasingly difficult to secure therapists and other professionals willing to work with the children. The Court's Decision describes numerous additional examples of Riordan's obstruction, all of which were included in the materials Defendant Swithin reviewed before repeating Riordan's false claims.

99. Throughout the trial, Riordan escalated her pattern of false allegations, and continued to have third parties accuse Plaintiff of sexual and emotional abuse. Each report triggered investigations that distressed the children, and each was found to be entirely unsubstantiated.

100. One of Riordan's treating psychiatrists (she had several) testified she appeared to be a "competent" mother. But further testimony revealed Riordan had concealed critical facts from the doctor, including:

a. Her repeated denigration of Plaintiff to the children;

b. Her coaching of the children to falsely accuse him of sexual abuse;

c. Her instructions to delete her incriminating text messages;

d. Her use of third parties to communicate with and manipulate the children;

e. Her direction that the children "spy" on Plaintiff by searching his laptop, phone, desk,

and attorney communications and provide the "evidence" to her; and

f. Her very public smear campaigns against Plaintiff and many others.

101. The Court also found that Riordan:

a. Filed false and incomplete affidavits, including financial disclosures;

b. Committed perjury and deliberately destroyed material evidence;

c. Employed third parties to intimidate witnesses;

d. Persistently violated court orders throughout the litigation.

102. These findings, documented in The Decision (pp. 12–24) — provided to Defendant Swithin — demonstrate Riordan's sustained pattern of deception, obstruction, and abuse of process, and her determination to destroy Plaintiff's relationship with his children, his reputation, and his quality of life.

103. By contrast, no court has ever found Plaintiff in violation of any order. In fact, The decision states he complied fully all obligations, including financial disclosures. He has never been sanctioned or even reprimanded by any court.

104. In November 2021, as the remote trial continued, Riordan's fifth attorney, Nickola Cunha, claimed that DCF had found Plaintiff guilty of sexually abusing his children and that Judge Adelman had "covered up" for him. Cunha demanded Judge Adelman's recusal for bias.

105. In response, Presiding Judge Thomas Moukawsher conducted a hearing and issued a 19-page *Memorandum of Decision* on December 10, 2021 (Entry #384.10, "Moukawsher

Decision"), finding that Cunha had repeatedly lied to the Court about both Judge

Adelman and Plaintiff.

106. Specifically, Cunha falsely asserted that "the DCF report (Exhibit 71) records that a

multi-disciplinary task force found that Christopher Ambrose had sexually assaulted his

children" and that Judge Adelman ignored this due to bias. (Moukawsher Decision, pp.

13–14).

107. Judge Moukawsher reviewed all records and investigations, writing: "It is certain that

DCF did not conclude that Christopher Ambrose abused his children in any way. It is

certain that no multi-disciplinary panel of experts concluded that Christopher Ambrose

abused his children in any way." (Id. at p. 14).

108. He further emphasized: "All three experts involved with the children said they had no

concerns about the father's behavior. DCF's conclusions were confirmed by its managers.

The Madison Police Department investigated and declined to bring charges, despite

anonymous callers accusing Ambrose of trafficking 'young Brown Latin American

boys.'" (Id. at p. 15).

109. On January 25, 2022, Judge Moukawsher issued a second ruling (Entry #390.10),

permanently disbarring Cunha and affirming that Plaintiff had been fully exonerated by

DCF, police, clinical experts, and all courts.

110. _Plaintiff's cease-and-desist letter to Defendant Swithin included the Moukawsher_

_Decision._ Nevertheless, despite actual knowledge of these findings, she refused to correct

her false portrayal of Plaintiff as a child sexual predator; her conduct betrays her actual malice.

111. While the divorce trial was ongoing remotely in Connecticut, Riordan secretly relocated to Big Pine Key, Florida, in September 2021 to live with Frank Parlato, Jr., who was under a 19-count federal indictment for conspiracy, fraud, money laundering, and tax evasion.

112. Plaintiff did not learn of Riordan's departure or her intimate relationship with Parlato until early 2023.

113. Riordan publicly denied any relationship with Parlato, just as she had denied her extensive communications with Boyne. However, on November 9, 2021, the Monroe County (FL) Sheriff's Office responded to a domestic violence incident at Parlato's residence.

114. Body cam footage captured Riordan telling deputies that Parlato was her "intimate partner," that she had lived with him since September 2021, and that he had been violent toward her.

115. On October 2, 2021 — mere weeks after Riordan moved in with him — Parlato published the first of more than 300 defamatory articles attacking Plaintiff on his sensationalist website *FrankReport.com* and other platforms controlled by him and/or Riordan's associates.

116. On April 26, 2022, following nearly a year of testimony and documentary evidence, the Court (Adelman, J.) issued its final decision, stating "One thing has been consistent throughout this long legal process: none of the allegations concerning the mistreatment of the three minor children have been substantiated." (The Decision, p. 19).

117. The Court awarded Plaintiff permanent sole legal and physical custody of the children. (Decision, p. 37). Riordan was granted only supervised visitation, contingent upon a complete psychiatric evaluation and court-supervised treatment aimed at "eliminating the defendant's behaviors that have had a negative impact on the minor children and their relationship with the plaintiff." (Decision, p. 37).

118. *To be clear, prior to publishing her article, Defendant Swithin knew of The Decision. Despite this knowledge, Swithin falsely portrayed Plaintiff as a child sexual predator, baselessly asserting that he had corrupted the judicial system and committed other morally reprehensible acts. Her published narrative intentionally placed him in a reputation-destroying false light.*

119. On July 10, 2025, Plaintiff provided Defendant Swithin with multiple court decisions and gave her the opportunity to correct her falsehoods. She refused, saying she would not "validate" anything he said and "consider[ed] the matter closed."

120. Her refusal demonstrates reckless disregard for the truth, actual malice, and an obsessive effort to destroy Plaintiff's reputation, mental health, and quality of life.

121. Swithin ignored the Court's findings that Riordan told the children horrific lies about their father and repeatedly coached them — including in writing — to falsely accuse him of sexual abuse (Decision, pp. 11, 19).

122. She also ignored the Court's determinations that Riordan used third parties to destroy Plaintiff's relationship with the children, damage his reputation, and intimidate witnesses.

123. Swithin insinuated that Plaintiff bribed or colluded with DCF, law enforcement, the GAL, the custody evaluator, the reunification specialist, therapists, and even Connecticut judges in order to gain custody. These claims are wholly unsupported, defamatory, and misleadingly place Plaintiff in a false light by fueling her conspiracy theories that the Connecticut family courts are corrupt and show a bias toward fathers.

124. Swithin further ignored the Court's observations that Riordan exhibited a pattern of conflict with numerous individuals, including education, legal and medical professionals, and displayed many traits consistent with Borderline Personality Disorder (Decision, p. 11). Although the Court ordered a psychiatric evaluation, Riordan refused to comply, preventing a formal diagnosis.

125. Swithin also disregarded the Court's recognition that Plaintiff consistently attempted to co-parent collaboratively; instead she falsely claimed that he prevented Riordan from seeing the children. The record shows the opposite: Riordan did not see the children because she chose not to comply with court-ordered psychiatric evaluation and treatment.

126. Plaintiff testified that he believed both parents should be present in their children's lives. After the custody orders, he repeatedly encouraged Riordan to undergo the required therapy so visitation could begin. She never responded to his written requests.

127. On Mother's Day 2021, Plaintiff facilitated a call between Riordan and the children, supervised by the court-appointed reunification specialist. She never requested another call (Decision, p. 18).

128. Plaintiff later learned why: Riordan was secretly messaging the children through apps in violation of court orders.

129. When Plaintiff discovered this covert contact, he did not report it, out of concern for the children's emotional well-being. He did not want to deprive them of their limited contact with their mother. This compassionate decision, however, had grave consequences for him.

130. Contrary to Riordan's later assertions, T-Mobile records conclusively establish that all three children possessed active cell phones during the entire period they were in Plaintiff's custody. The records further show that no numbers were ever blocked and that the children maintained unrestricted ability to communicate with anyone of their choosing—including Riordan and members of her extended family. The phones were continuously active and were disabled only for brief intervals as a reasonable parental consequence for misbehavior. Riordan's contrary claims were knowingly false and

consistent with her broader pattern of fabricating allegations to undermine Plaintiff and distort the factual record.

131. During these communications, Riordan resumed her campaign of lies, telling the children that Plaintiff was to blame for her absence, that he did not love them, and that he only sought custody "to beat her." These were the same sorts of lies that led to her loss of custody.

132. Swithin also reported that Plaintiff refused to allow Riordan's family to see the children. In fact, Plaintiff made efforts to maintain the children's ties with her extended family.

133. He encouraged calls, texts, and online gaming with their cousins, and hosted Riordan's sister, niece, nephews, cousin, and aunt during the Christmas season in 2021, 2023, and 2024.

134. Despite Plaintiff's goodwill, none of Riordan's family invited the children to visit after April 2020. Riordan's father even stopped acknowledging the children on their birthdays or Christmas, and did not even inquire about them.

135. Plaintiff also arranged in-person visits with the children's friends in Westport. Eventually, the children declined these visits after peers told them they had seen defamatory online articles, which Plaintiff later confirmed with a Westport parent.

136. Plaintiff provided each child with a cell phone. T-Mobile records confirm he never disabled service for more than a few hours as a consequence for misbehavior, and he never blocked numbers. The children were always able to contact anyone—including

Riordan, her family, friends, and authorities, further contradicting Defendant Swithin's claims that Plaintiff isolated the children.

137. The children never reported any mistreatment of any kind. Their therapists uniformly reported to authorities that the children never accused Plaintiff of sexual, emotional, or verbal abuse.

138. Nevertheless, Swithin exacerbated the children's harm by publicly attacking anyone she perceived as adversarial to Riordan, including the custody evaluator, GAL, therapists, DCF workers, the reunification specialist, and judges. Her baseless accusations that Plaintiff "conspired" with these professionals undermined the children's trust in the very people assigned to protect them, and destroyed Ambrose's reputation.

139. Defendant Swithin also falsely claims that Ambrose was "the solitary claim of neglect or abuse against Riordan." As demonstrated the record shows every professional involved in the case — including the custody evaluator, GAL and DCF, and judges, among others — expressed alarm at Riordan's conduct with the children.

140. Despite Swithin's insinuation, there there's never been a police report or any action taken against Ambrose for stalking.

141. Plaintiff has never published information about Riordan, Swithin, or anyone connected to the case.

142. In January 2023, Riordan returned to Connecticut without informing Plaintiff and rented a residence near him. She immediately began violating the custody orders by secretly

visiting the children and grooming them to turn against their father—the precise behavior
the custody orders were designed to prevent.

143. On April 22, 2023—almost exactly one year to the day after The Decision was issued—
Riordan persuaded the daughter to run away to her.

144. Riordan immediately brought the child to file a petition for emancipation and false sexual
abuse allegations against Plaintiff in New Haven Juvenile Court. The daughter had
always been the most susceptible to Riordan's control and lied at her direction. (Decision,
e.g., p. 19).

145. Using close "associates," Riordan later took unlawful custody of the two sons and
arranged for false abuse petitions to be filed before they were even brought to her
residence.

146. Riordan and her intimate partner Parlato then published these sealed petitions—an
egregious breach of privacy that exposed the children's peers, coaches and teachers to the
false allegations of sex abuse, drug use, and other allegations.

147. As the Court noted, "the defendant's behavior certainly called into serious question her
judgment and competency to parent these minor children well beyond the issues raised by
the court-ordered evaluation." (Decision, p. 17).

148. Once she had the children, Riordan replaced their phones, as she had done years earlier
when she fled Connecticut after Plaintiff filed for divorce, leaving him unable to locate or
contact them.

149. Plaintiff repeatedly attempted to negotiate with Riordan, but she ignored him while continuing to provide false narratives for publication with Swithin and Parlato.

150. Although Riordan orchestrated the filing of the abuse claims, she obstructed the subsequent DCF and police investigations. She refused access to her home, disallowed private interviews, and required investigators to speak to the children through windows while she intrusively filmed the encounters.

151. DCF interviewed the children at school, as well as their therapists and counselors. After comprehensive investigations, both child protective services and law enforcement found the allegations against Plaintiff baseless. [1]

152. Nevertheless, because custody disputes are civil matters, police would not remove the children from Riordan's home without a specific court order.

153. Desperate to recover his children, Plaintiff—whose finances had been depleted by the divorce—initially represented himself. The state's attorney and legal aid society provided conflicting advice about how to proceed, and his good faith filings were repeatedly rejected as procedurally deficient.

154. Plaintiff eventually retained counsel, but delays continued. Riordan secured a three-week continuance, then the Court (Rodriguez, J.) *sua sponte* postponed the hearing for six more weeks, before abruptly declaring a mistrial without explanation and transferring the case to another courtroom (Nieves, J.).

_____

[1] Ultimately, all three children—represented by independent counsel secured by Riordan—voluntarily withdrew their abuse petitions in Juvenile Court.

155. Judge Nieves determined that Plaintiff's latest filing was procedurally insufficient for relief. Months were thus squandered due to Riordan's manipulation and systemic inaction.

156. Contrary to Swithin's published assertions, neither Judge Rodriguez nor Judge Nieves made any rulings on evidence related to coercive control or other substantive issues; their decisions were confined to limited procedural matters. Swithin's statements are knowingly misleading and calculated to create the false impression that Ambrose illicitly influenced a corrupt family court system—consistent with her well-documented pattern of promoting conspiracy narratives.

157. At significant expense, Plaintiff hired new counsel, who filed for restraining orders on behalf of the children, citing Riordan's blatant contempt of custody orders and her pattern of coercive control, recognized as domestic violence.

158. At the two-day hearing, both Riordan and Plaintiff testified, as did DCF, who reported that Riordan—the accuser—was hostile and uncooperative, while Plaintiff—the alleged abuser—was cooperative.

159. After extensive interviews with multiple parties, including the children, DCF concluded that Riordan exerted coercive control over the children's thoughts, emotions, and actions, consistent with recognized forms of domestic violence.

160. The Court (O'Neill, J.) granted the restraining orders, prohibiting Riordan from contacting the children.

161. Riordan failed to appear in court for the ruling and refused to speak with the Court by phone, as she had on prior occasions. When police attempted service, they found her residence vacant, as they had previously.

162. Swithin falsely claimed that the children had independently "fled" to Riordan's father in Rhode Island. In fact, testimony established that their grandfather had removed himself from their lives since April 2020 and had not contacted them even on birthdays or Christmas.

163. Evidence showed that it was Riordan who arranged for her "associates" to take the children to her father in Rhode Island before police arrived to serve the restraining orders. Her father was not made aware of Riordan's plan, and expressed his frustration, anger and upset at being "put in the middle."

164. When Plaintiff located the children Rhode Island, Riordan again used third parties to move them secretly out of the state before Ambrose could get the necessary RI court order.

165. Riordan had the children sent to other associates in different counties in NY state. Each move triggered new investigations by law enforcement and child protective services, all of which again cleared Plaintiff of wrongdoing.

166. Each time Plaintiff obtained the necessary jurisdictional court orders to recover the children, Riordan and her associates relocated them, sometimes in the middle of the night.

167. After three and a half months living like refugees—being moved on a moment's notice, missing school, activities, friends, therapy, medication, and stability—the children were finally returned to Plaintiff, having missed the first third of the school year.

168. Though Riordan claims to be indigent and unable to pay child support, since October 2023 she has retained private counsel who has filed multiple lawsuits against Plaintiff and others, billing over $130,000 to date.

169. One such action against the Plaintiff alleged vexatious litigation and stalking (though Riordan had never even made a police report). Plaintiff represented himself. That case alone consumed eight full hearing days.

170. Before those proceedings concluded, the Court issued a ruling in another matter, expressly finding that every one of Riordan's witnesses—including Gomez, Lee, and Riordan herself—lacked credibility. These were the very witnesses Riordan was relying upon in her vexatious litigation case. So, Riordan moved to disqualify the judge for bias, which was denied. She then withdrew her lawsuit for vexatious litigation against Plaintiff.

171. In summary, in direct contradiction of Swithin's published claims, Plaintiff has never used the courts to harass Riordan, either before or after the divorce. By contrast, Riordan has engaged in repeated abusive litigation against him.

172. Despite having access to the court-determined truth—based on months of testimony from police detectives, DCF investigators, the custody evaluator, the GAL, Riordan's own

psychiatrists, and numerous other witnesses—Defendant Swithin instead relied on Riordan, who courts had repeatedly sanctioned for perjury and other egregious misconduct.

173. Swithin deliberately amplified Riordan's falsehoods online, misleading the public and Plaintiff's children, who were too young to access court or police records, into believing her defamatory narrative.

174. To intensify the harm, Swithin used her article attacking Ambrose to promote and legitimize defamatory publications by Riordan's partner, Frank Parlato, and by psychiatrist Bandy Lee—whom Riordan hired - to support her smear campaign. By essentially republishing false statements by Parlato and Lee, discredited figures enlisted by Riordan, Defendant Swithin amplified and perpetuated their false narratives against Ambrose.

175. Lee had been terminated from her medical position after colleagues raised concerns about her deficient medical knowledge and ethical violations. In one notorious episode, she publicly "diagnosed" an individual she had never examined as psychotic—the same reckless conduct she repeated by branding Plaintiff a mentally ill child predator, as amplified by Swithin. By portraying Lee as a "world-renowned expert on violence," Swithin lent undeserved credibility to Lee's falsehoods, compounding the damage to Plaintiff.

176. Swithin also knowingly identified the Ambrose children by name as alleged victims of
sexual abuse—an egregious violation of privacy and universally rejected journalistic
standards.

177. By publicly identifying the children by name, Swithin exposed the very minors she
claims to protect, laying bare the hypocrisy of her professed advocacy for children's best
interests.

178. Swithin was aware that multiple courts had found that Riordan manipulated and coached
the children to make false accusations. Nevertheless, Swithin exploited these coerced
statements to cast Plaintiff in a false light and further her defamatory campaign.

179. Swithin stated that she interviewed one of the children; however, she knew they were too
young to consent to such exploitation, and that Riordan—stripped of legal custody and
under sanction—had no legal authority to consent on their behalf.

180. Defendant's portrayal of Plaintiff as a child sex abuser was not only false and malicious,
but deliberately sensational, intended to shock, titillate, and drive traffic to her website.

181. Swithin further insisted that the children should testify in court—a position unanimously
rejected by mental health professionals as harmful. By contrast, Plaintiff refused to call
the children as witnesses in order to spare them further trauma.

182. Therapists consistently reported that articles like Swithin's reinforced Riordan's lies,
leaving the children confused, destabilized, and traumatized.

183. Swithin's defamatory campaign has had a devastating effect on Plaintiff's relationship with his children—an injury even more grievous than reputational harm.

184. Her false narrative also functioned as a vehicle to promote her fringe conspiracy theory: that wealthy fathers bribe Connecticut family courts to "steal" custody from so-called protective mothers.

185. Most egregiously, Defendant published the cruel sentiments that she, Riordan and her associates coaxed from the children after they were unlawfully taken in violation of custody orders, though Swithin knew every professional involved concluded that Riordan exercised coercive control and relentlessly coached the children to falsely accuse their father.

186. By publishing these coerced statements, Swithin knowingly exploited the children's trauma to amplify Plaintiff's emotional distress and to increase traffic to her website, while disregarding the additional harm her conduct caused to the children themselves. Such actions are inconsistent with her claimed role as a child advocate.

## IV. SUPPLEMENTAL ALLEGATIONS OF POST-FILING DEFAMATION AND CONTINUING ACTUAL MALICE

187. Despite her admitted actual notice of this lawsuit and being expressly advised to cease her defamatory conduct, Defendant has instead escalated her campaign of malicious falsehoods against Plaintiff to further destroy his reputation and quality of life,

demonstrating her continuing reckless disregard for the truth and her ongoing actual malice.

188. Within days after Plaintiff notified Defendant of the filed Complaint, via email and USPS, Defendant publicly discussed it in detail on her social media platforms, including Facebook, Instagram, and her *One Mom's Battle* blog—even as she claimed she had not seen or read it.

189. Simultaneously, she launched multiple GoFundMe campaigns soliciting donations to "fight a **million-dollar lawsuit** designed to silence her and erase her voice from the movement she built." [Emphasis in original.]

190. In these public postings, Defendant baselessly portrays Plaintiff Ambrose—clearly identifiable as the plaintiff in this lawsuit—as being aligned with "powerful groups that profit from family-court chaos" who are "targeting her, hoping to destroy her work and intimidate others who speak out." (*One Mom's Battle* blog, September 2025). These statements are intended and understood to convey that Plaintiff is part of the conspiracy Defendant frequently describes: a corrupt and abusive network that seeks to harm so-called "protective mothers" and their children. By associating Plaintiff with this alleged network, Defendant has cast him in a false and highly offensive light and further defamed him by imputing to him nefarious motives and participation in systemic abuse.

191. Defendant also features, promotes, and hyperlinks to a video "interview" of Plaintiff's daughter in which the daughter—who multiple courts have found to be under the

coercive influence of her mother, who is also Defendant's client—repeats discredited allegations of abuse against Plaintiff.

192. As Defendant knows from the judicial decisions Plaintiff previously provided, multiple Connecticut authorities, including the police and DCF, investigated all allegations and found them baseless. In addition, every judge who has heard the case has determined that the daughter's statements regarding abuse were false and made under maternal coercion.

193. The video Defendant has hyperlinked on her social-media account is hosted on the YouTube and Substack pages of Richard Luthmann, a convicted felon only recently released from federal prison for extortion and fraud, and another aspiring "journalist;" both are close associates of Plaintiff's deeply troubled ex-wife.

194. Luthmann has a documented record of defaming and threatening Plaintiff with physical violence. The pages on which the video appears label Plaintiff as a "child sexual abuser," "pedophile," "child molester," and "CHOMO," a prison slang term for "child molester" that felon/former convict Luthmann often uses.

195. By hyperlinking to, featuring and promoting these social media pages, Defendant is republishing and endorsing their defamatory statements with knowledge of their falsity or with reckless disregard for the truth. In so doing, Defendant continues to intentionally cast Plaintiff in a false light, seeks to destroy his reputation and inflict additional emotional and professional harm.

196. In her July 17, 2025 written response to Plaintiff's cease-and-desist letter, Defendant threatened to publish her own "interview" with Plaintiff's daughter—even though she knew that multiple investigations and courts had found the daughter's statements to be false and the product of coercion by her mother, who is Swithin's client.

197. Since Plaintiff filed this action and provided Defendant with actual notice of it, she has been intensifying her efforts to malign Plaintiff publicly, amplifying her falsehoods through multiple social-media channels.

198. Defendant's continued and escalated campaign has incited her audience—reportedly exceeding 250,000 followers—to engage in severe online harassment of Plaintiff, including defamation, ridicule, and even threats. Defendant's continuing publication of defamatory statements to deliberately incite harm to Plaintiff provides direct evidence of her actual malice.

## V. LEGAL STANDARDS AND APPLICATION

199. Based on Defendant's July 17, 2025 email, Plaintiff anticipates that she will attempt to invoke the protections of the First Amendment. That defense fails.

200. The First Amendment does not shield knowingly false statements of fact that destroy reputations. It is well established that defamation—particularly when published with actual malice—falls outside constitutional protection. As the Supreme Court has held: "There is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-

open' debate on public issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974)

(quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

201. Defendant's publications were not only knowingly false, but calculated to inflict

maximum harm on Plaintiff's reputation, family relationships, professional life and

emotional well-being. They therefore constitute actionable defamation and are

unprotected by the First Amendment. While the Court has extended "a measure of

strategic protection" to falsehoods to safeguard legitimate speech, it has consistently held

that intentional falsehoods lack First Amendment value. *Gertz*, 418 U.S. at 342.

202. Defendant may also argue, as she has before, that Connecticut's anti-SLAPP law requires

dismissal of any lawsuit "targeting protected speech." That too is wrong. Conn. Gen. Stat.

§ 52-196a does not immunize demonstrably false and malicious statements from liability.

To the contrary, it expressly provides that dismissal must be denied if the plaintiff

establishes a prima facie case for defamation—namely, a false statement of fact,

published to a third party, causing reputational harm. Plaintiff can do so here.

203. Among many false, offensive statements, Defendant published this online: *"Ambrose has

made countless false claims about Riordan's fitness as a mother while perpetrating abuse

—verbal, emotional, and sexual—against their three children."* Defendant wrote this

despite reading court decisions concluding that every allegation of abuse was false, that

Plaintiff had been exonerated by DCF, law enforcement, and courts, and that Riordan had

coached the children to make false claims.

204. By asserting the opposite narrative, Defendant knowingly placed Plaintiff in a viciously misleading false light. Connecticut law provides multiple remedies for such conduct:

- **False Light Invasion of Privacy.** Publicity that knowingly or recklessly places another in a false or misleading light, highly offensive to a reasonable person, is actionable. See *Restatement (Second) of Torts* § 652E; *Pace v. Bristol Hosp.*, 964 F. Supp. 628 (D. Conn. 1997); *Parnoff v. Aquarion Water Co.*, 188 Conn. App. 153 (2019). Unlike defamation, false light targets the emotional injury from being portrayed inaccurately.

- **Public Disclosure of Private Facts.** Connecticut recognizes liability for the publication of true but private information that is not of legitimate public concern. See Restatement (Second) of Torts § 652D, adopted in *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107 (1982). Truth is not a defense to this tort.

- **Intentional Infliction of Emotional Distress.** Liability attaches when conduct is extreme and outrageous, intentionally or recklessly causing severe emotional distress. *Petyan v. Ellis*, 200 Conn. 243, 510 A.2d 1337 (1986).

- **Harassment.** Connecticut law also prohibits communications made with the intent to harass, annoy, or alarm, where such effects are reasonably likely. Conn. Gen. Stat. § 53a-183.

205. This action seeks to hold Defendant Tina Swithin accountable for intentionally inflicting harm through demonstrably false, malicious statements, and for trafficking in distortions that endangered Plaintiff's reputation and emotional health, and caused other harms.

206. Defendant has no constitutional defense, and Connecticut law provides no safe harbor for such misconduct. The case is straightforward: the facts are undisputed, the law is settled, and each day this matter proceeds increases Defendant's liability. Plaintiff respectfully asks this Court to provide relief commensurate with the harm caused.

## VI. DEFENDANT SWITHIN'S ASPIRATIONS AND INFLUENCE

207. Defendant Tina Swithin operates on multiple platforms, including *onemomsbattle.com*, through which she published the defamatory article targeting Plaintiff. Her site reaches a worldwide audience and, through Instagram, Facebook, and YouTube, she extends that reach to millions more, ensuring that the reputational harm to Plaintiff is both broad and ongoing.

208. Swithin is no novice in publishing. She runs paid online courses, operates a paid support group, and has authored four books on divorce. She appears in podcasts, mainstream publications, and other media to advance her views and gain publicity.

209. In these roles, she holds herself out as an authority and cannot claim ignorance of the duties that accompany publishing to the public.

210. As part of her campaign against Plaintiff, Swithin deliberately linked to and promoted articles by Frank Parlato and Dr. Bandy Lee—both discredited sources—knowing their allegations had been rejected by police, DCF, and the courts.

211. These links were not neutral references; they were carefully curated, prominently featured and used to bolster her own defamatory narrative.

212. Courts have long recognized that "one who republishes or otherwise endorses defamatory matter is subject to liability as if he had originally published it." *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015); *Restatement (Second) of Torts* § 577. Similarly, a publisher who "endorses and promotes" defamatory content authored by others is not shielded from liability. *Enigma Software Group USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 278 (S.D.N.Y. 2016).

213. Swithin's conduct was intentional and malicious. She published falsehoods about Plaintiff to audiences already inclined toward conspiracy theories and a mistrust of custodial fathers, motivated by hostility, loyalty to Riordan's vendetta, and a desire for publicity and financial gain.

214. She further encouraged her readers to disregard official findings that exonerated Plaintiff and instead to malign him. Her knowing disregard of contrary evidence—police findings, DCF determinations, and even judicial rulings—is the very type of "deliberate avoidance of the truth" that constitutes actual malice. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989).

215. As a direct result of these acts, Plaintiff has sustained severe reputational injury, emotional distress, and other damages that continue to this day. Accordingly, Swithin's liability for defamation is clear and unavoidable.

## VI. DEFENDANT SWITHIN'S DEFAMATORY STATEMENTS

216. The following statements were published by Defendant Swithin in the September 2023 article entitled *Rebranding "Parental Alienation" into Coercive Control* and published on her blog, *One Mom's Battle*. Each is false, misleading, places Plaintiff in a false light, or unlawfully discloses private facts:

217. *"Throughout their legal battle, Ambrose has made countless false claims about Riordan's fitness as a mother while perpetrating abuse – verbal, emotional, and sexual – against their three children."*

218. *"Coercive control refers to behaviors that seek to dominate and control nearly every aspect of a victim's life. According to Jennifer's Law, these behaviors may include isolation, degradation, micromanagement, manipulation, stalking, sexual coercion, threats, and punishment, and often predict more violent forms of abuse. These are the very behaviors the teenagers claim their father has subjected them to during three years in his sole care, and they have evidence to support their claims."*

219. *"Although Jennifer's Law is designed to protect survivors of domestic abuse, Ambrose has manipulated the law to depict Riordan as a controlling and abusive parent, claiming that she coerced the children to file petitions against Ambrose in juvenile court. When the teens exercised their legal rights to redress grievances in court – which provided them with their own counsel – their actions were used as evidence that Riordan brainwashed and coached them into taking legal action."*

220. *"Matthew and Sawyer filed before they sought safe haven with their mom, but that mattered little. The coercive control was determined without notifying the children's counsel, thereby denying them the right to object to Ambrose's petition against their mother. These alleged victims were denied the right to testify under PA 21-78."*

221. *"When the RO was ordered against the teens' will and consent, they fled. On September 7th, Ambrose will request the Connecticut Superior Court to consider incarceration as a sanction for Riordan's continued pattern of coercive control – but without any factual basis for this claim."*

222. *"Most recently, Ambrose claimed that Riordan coerced the teens to flee to Rhode Island to 'avoid the authority of the Court and frustrate implementation of its orders,' in the words of Ambrose's attorney, Alexander Cuda. However, there is no order that the mother was responsible for the "return of the teens" – as if they were property."*

223. *"As a result of the RO, the teens have been isolated from Riordan; but for the first time after years of isolation, the children have reconnected with their extended family and*

*friends, who Ambrose eliminated from their lives three years ago: a clear and painful example of coercive control. The youngest, Sawyer, recently appeared at his grandfather's home unannounced. He had not seen his grandfather since he was 9 years old."*

224. *"Judge Jane K. Grossman accused Riordan of PA [parental alienation] and awarded Ambrose primary custody of Mia, Matthew, and Sawyer in April 2020, based on a custody evaluation report which was paid for by Ambrose."*

225. *"Guardian ad litem (GAL) Jocelyn Hurwitz, was appointed to the family's case without Riordan's consent, billing her time at $400 an hour. Hurwitz supported Caverly's recommendation of total isolation from and no contact with mother."*

226. *"Dr. Robert Horwitz, a New Haven-based family therapist was recommended by the GAL and was also appointed against Riordan's consent. The children were court-ordered to have individual counselors selected by the parents, based on who would advocate for the children and their needs. This order was to be implemented by September 5th, 2019, but was never honored."*

227. *"Ambrose pays all bills to Caverly and Horwitz and has unilaterally controlled all money since 2018."*

228. *"In response to the traumatic separation from their mother and with allegations of ongoing abuse by their father, the teens have struggled extensively with their physical and mental health."*

229. *"Inevitably, all three teens have reached a breaking point. They made carefully considered plans to escape Ambrose for good. They felt they needed to save themselves."*

230. *"Despite being found safe and happy in Riordan's care by their own attorneys, police, and case workers, Ambrose's litigation abuse escalated. His unrelenting harassment and threats to have the children removed from their mother's care was anxiety-producing for all three of them. Mia, Matthew, and Sawyer just want to live happily with their mom and be left alone."*

231. *"The solitary claim of neglect or abuse against Riordan comes from Ambrose, who has been identified as her abuser – and the very reason why the State of Connecticut provided her a 'Safe at Home' address."*

232. *"Recent stalking by Ambrose, documented in Riordan's medical records, was disclosed in a prior hearing. In this hearing, the judge denied all of Ambrose's motions, concluding there was no need for the children to be protected from their mother – but this too was ignored by O'Neill."*

233. *"Prior to Judge O'Neill, both judges who presided over the case denied Ambrose's requests to secure ROs against Riordan. The judges – Eddie Rodriguez and Gladys*

*Nieves – recognized the baselessness of Ambrose's claims: namely, there was no evidence to support Karen's use of coercive control. Judge Nieves additionally denied Ambrose's request for Riordan's incarceration."*

234. *"But when the court appointed Judge O'Neill, all of this changed. O'Neill was <u>sworn into the Connecticut Superior Court</u> on May 4th, 2023. Since assuming this position, he has already overturned the judgments of Rodriguez and Nieves and issued an RO that defies the rights and lived experiences of Mia, Matthew, Sawyer, and Riordan."*

235. *"When abusers like Ambrose manipulate 'coercive control' in family court, they twist the law to endorse the total victimization of victims it's intended to protect,' Riordan said."*

236. *"This case is gaining attention from concerned professionals and advocates for domestic violence survivors, including Dr. Bandy X. Lee: a Yale- and Harvard-trained psychiatrist and world-renowned expert on violence."*

237. *"In a letter to Lieutenant Perron of the Madison Police Department in CT, Dr. Lee cited 'extensive and reliable evidence as to why any child should not be sent back to Mr. Christopher Ambrose, a man who has not only abused Ms. Riordan's children but has engaged in aggressive litigation abuse and seizure of these children.'"*

238. Defendant Swithin deliberately hyperlinked to and incorporated into her article Frank Parlato's August 8, 2023 piece titled *"CT Judge Orders Teens Away From Mother; Ignores Claims of Father's 'Abuse'; Ambrose Teens Homeless"*, as well as another defamatory article titled '*Oh No! New Coercive Control Law 'Contorted' Against Mom*'

239. By strategically embedding these links in her own narrative, Defendant did not merely "reference" outside material—she endorsed, curated, and republished third-party defamation in a manner calculated to cause maximum reputational harm to Plaintiff.

240. ***Courts have long recognized that hyperlinking to and endorsing defamatory material constitutes a republication, subjecting the publisher to liability for the repeated dissemination of false and injurious statements.*** *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015); *Restatement (Second) of Torts* § 577. Courts further recognize that when a publisher selectively incorporates or promotes third-party content as her own, she "adopts" the defamatory meaning and becomes directly liable. *Enigma Software Group USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 278 (S.D.N.Y. 2016).

241. While the Second Circuit has held that a bare hyperlink, without endorsement, may not constitute republication, *Adelson v. Harris*, 876 F.3d 413, 417 (2d Cir. 2017), that rule does not apply here. Unlike in *Adelson*, Swithin did not neutrally reference outside content; she deliberately curated Parlato's article, placed it within her own defamatory piece to reinforce her narrative, and presented it as corroboration of Riordan's false claims. In such circumstances, courts have found republication liability. See *Enigma Software*, 194 F. Supp. 3d at 278.

242. At the time of her publication, public records—including police reports, child protective services findings, and binding court orders—had already determined Riordan's allegations of abuse to be baseless. Multiple courts had sanctioned Riordan for perjury, stripped her of custodial rights, and found her testimony not credible. Yet Swithin disregarded these judicial findings and instead elevated Riordan's discredited narrative by embedding Parlato's defamatory piece in a prominent and damaging position within her article.

243. This decision was neither incidental nor accidental. By placing the Parlato article exactly where it would reinforce her own defamatory accusations, Swithin ensured that readers would treat it as corroborating evidence. Such curation reflects intentional malice—the knowing amplification of falsehoods in defiance of established truth. See *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) (deliberate avoidance of truth and reliance on discredited sources is evidence of actual malice).

244. The malicious nature of Defendant's conduct is further underscored by her refusal to correct the record even after receiving direct notice of the truth. On July 10, 2025, Plaintiff Ambrose emailed Defendant Swithin copies of two court decisions that conclusively demonstrated the falsity of her published statements.

245. Plaintiff also provided Swithin with his Complaint filed in this Court against Dr. Bandy Lee, containing additional evidence disproving the very allegations Swithin repeated. Despite this direct notice, Defendant refused to retract or correct her defamatory content, leaving it accessible on her blog for nearly two years.

246. This persistence, despite incontrovertible evidence, is powerful proof of actual malice and has compounded the lasting harm to Plaintiff's reputation and emotional well-being.

### August 8, 2023 Publication

247. To further cast Ambrose in a false light, Swithin included a hyperlink to an article published on August 8, 2023 by Riordan's intimate partner, Frank Parlato Jr., entitled *"CT Judge Orders Teens Away From Mother; Ignores Claims of Father's 'Abuse'; Ambrose Teens Homeless"* by Frank Parlato https://frankreport.com/2023/08/08/ct-family-court-judge-thomas-oneill-orders-ambrose-teens-away-from-mother-bars-riordans-contact-with-the-daughter-matt-and-sawyer-for-one-year/Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

248. *"Because Ambrose took all their marital funds and Riordan's inheritance…Judge Grossman based her decision on a custody evaluation report paid for by Ambrose."* Parlato hyperlinks to the entire custody evaluation, which the Court had ordered <u>sealed</u> because it contains

confidential information about the children and the parties. As the matrimonial Court (Adelman, J.) stated, Riordan likely provided this confidential document for publication.

249. *"Riordan had raised [the children] since each was adopted at less than six months of age… Ambrose worked away from home – an absentee father… Soon afterward, he changed the passwords of the joint accounts, locked Riordan out of her own funds, including her inheritance, hired experts to support his preplanned parental alienation narrative, then filed for divorce… Away from their mother, the children rapidly declined and plunged into depression… "[A]fter three years isolated from their mother and the extended family they grew up with…"*

250. Parlato published the same hyperlink to The Riordan Letter, DCF Report, Psychopath Checklist, and Qualifications he published in his Aug 3, 5, and 8 (part 1) articles. The hyperlinked documents have been detailed above and should be incorporated here as if fully set forth.

251. Parlato uses the linked material to amplify and "corroborate" his false narrative against Ambrose. It is clear that Parlato is not merely "reporting" what Lee said, he is promoting and endorsing her comments, deliberately casting Ambrose in a false light.

252. Parlato also published the full text of an August 8, 2023 *ex parte* letter Lee inappropriately sent to Judge Thomas P. O'Neill of the Connecticut Superior Court at Bridgeport (the "O'Neill Letter"), who issued restraining orders on behalf of the children against Riordan (and subsequently found Riordan in contempt of those orders).[2]

---

[2] Lee was desperate to testify as an expert witness for Riordan and even appeared in the courtroom, interrupting the hearing. The Court declined to qualify her. Undeterred, she ensured the Court "heard" her by sending the O'Neill Letter. Lee says she's been involved in dozens of family court cases; therefore, she knows that privately contacting a judge about a case over which he presides is unethical and has potentially severe consequences.

253. Lee's statements in the O'Neill Letter are false or so twist the facts determined in court and police reports that they put Ambrose in a false light: *"I must warn against your sending Ms. Karen Riordan's children to Mr. Christopher Ambrose. He is no ordinary violent man...I have heard recordings of Mr. Ambrose's threatening the daughter with vaginal penetration as punishment for minor misbehavior...All three children have reliably reported sexual abuse, and no one has believed them, frankly, because the father is so threatening, he has intimidated all witnesses (he has already been threatening to me, which I had to report to local police)...The 12 (now 13)-year-old recently reported anal penetration... Even if none of this occurred, their lives seem to have been living 'hell' from his coercive control, verbal, emotional, and psychological abuse, and isolation from the mother who raised them (the father did not raise them) for over three years, which is abundantly and clearly recorded. [Ambrose's] aggression is such that, immediately after the first child ran away, he found out their address from the Connecticut Address Confidentiality Program, hunted her down, and stalked her everywhere in his car, almost causing her to have an accident."*

254. To support his own false narratives about Ambrose, the Connecticut courts and DCF, Parlato's published article uses Lee's misleading insinuations about Ambrose which had been investigated and determined false by therapists and public investigators, and her conspiracy theories about the courts, *"As expected from [Ambrose's] coercion, these children exhibit objective signs of severe trauma: resorting to substances, self-harm, and suicidal thoughts while living with him, as well as going from normal weight to morbid obesity, as you have heard... Child protective services investigations were noted, but as a violence expert of twenty-five years' experience, I can tell you that I have found them to be too frequently wrong to be solely relied upon. Individuals of the most dangerous personality disorders go undetected... I told this to one of the supervisors at the Department of Children and Families, as Mr. Ambrose is just such an individual, but they have not followed up, which shows that they are not only ineffective, they are also insincere: these are children who have reported being severely punished if they ever gave a true report of Mr. Ambrose's abuse against them, and DCF should know that this threatening behavior is common among the most dangerous individuals."* Parlato knew what he published these statements that DCF and the police had done thorough investigations, presented to and accepted by the courts.

255. Parlato's article refers to Ambrose as Riordan's *"violent abuser"* and makes other false claims about Ambrose, *"[Ambrose] was able to hire a ['high-powered attorney'] only because he embezzled [Riordan's] inheritance and stole everything she had... It came out during the proceeding that this violent man, who lost his law license and was fired multiple*

*times apparently for plagiarism and fraud, did not stop even when he rendered his ex-wife homeless."*

256. Since Parlato identifies Lee as an "expert in child abuse and psychopathy," a reasonable person would understand that a psychiatrist specializing in domestic violence determined Ambrose to be a violent, dangerous psychopath who committed the most horrific sexual abuse against his children, abused and stole from his wife, leaving her homeless, that he lost his law license was lost and was fired multiple times for cause. Swithin endorses this information in her published article.

257. Moreover, at the time Parlato published, all Lee's allegations - including her claims to have recordings evidencing Ambrose's abuse of the children - had been investigated by public authorities, including DCF and the police, and found baseless, which the Court affirmed after testimony. Nevertheless, Swithin uses Lee's statements to support her published false allegations against Ambrose.

258. Each of these assertions is either wholly false, materially misleading, or an intentional disclosure of private information published without context solely to humiliate.

259. Swithin  insinuates that she has reviewed records, yet selectively distorted or misrepresented them to mislead and create a false narrative placing Ambrose in the most damning false light as a child sexual predator. That she refused to correct her falsehoods further evidences her continued reckless disregard for the truth and establishes her actual malice.

260.In addition to her own defamatory assertions, Defendant deliberately amplified third-party

falsehoods by hyperlinking to and promoting content from others, including Frank Parlato,

Jr.—Riordan's intimate partner—who has a documented criminal history and has published

more than 300 defamatory articles against Plaintiff.

261.The Parlato article elicited 83 comments from readers, nearly all denigrating Ambrose,

which Swithin's hyperlink makes available to her audience of at least 250,000. Below is a

sampling, which manifest the repetitional harm such a publication does to an innocent

person:

- *"Just reread this and am reeling that there is a recording of Chris Ambrose threatening his daughter w vaginal penetration as punishment and I am physically ill. Not to mention the sons claim of actual anal penetration. How could this abuse be ignored by the courts and this Judge ???? Why is this man not in prison? In Texas, he would have already been buried under the courthouse and apparently if you appear before judge O'Neill in CT, your children you abuse are handed back to you on a silver platter and the mom trying to protect them from further abuse forced away. OUTRAGED!"*

- *"Ambrose, go fuck some males of consenting age you dirty fucked up pervert. Can't wait to see you imprisoned."*

- *"Who knew there was a loophole for abusers to get off scott free? Two magic words = coercive control and poof! emotional, physical and sexual abuse crimes magically disappear. This man should be jailed many times over for what he's done. Why isn't he being investigated for his crimes ???"*

- *"I think Ambrose is a very special case. His actions tick off every box for psychopathy. There are some people you don't have to meet to know they are sickos and pure evil: Hitler, Stalin, Vlad the Impaler…and Christopher Ambrose."*

- *"Everyone knows this man is a monster. That he also illegally took marital funds."*

- *"Has this man Ambrose and the court system that enables his cruelty – no damn shame? not the slightest care or feeling for the damage caused? Using the full force of law as an attack dog against innocent youth and their mother? How can this end well for these evil perpatrators?"*

- *"Why isnt it possible for the police to arrest both Ambrose and all the court actors responsible for years of cruel and unusual abuse, kidnapping, and perjury"*

- *"He's a psychopath for sure."*

- Over three dozen comments specifically reference Connecticut, demonstrating the audience for a Connecticut case is naturally the citizens of the state. Here are a few:

- *"Let's post letters, emails, telephone calls and responses to chart which legislators are helping and which legislators need to be shown the door.Connecticut citizen representation: https:// www.cga.ct.gov/asp/menu/cgarepresentation.asp"*

- *"Several people working in Connecticut family courts literally have no shame. Gerard Adelman, Robert Horwitz...actually get a kick out of the harm they've done to the children and families there for decades."*

- *"The people of Connecticut have no idea what has been happening int he family courts because mainstream news outlets have only reported the narrative the most corrupt administrators presented to the general public."*

- *"Nearly unbelievable, but totally believable in this state. Just criminal."*

### September 3, 2023 Publication

262. To further cast Plaintiff in a false and defamatory light, Defendant Swithin featured and

prominently hyperlinked to an article published on September 3, 2023, by "The Women's

Coalition," entitled *"The Oh No! New Coercive Control Law 'Contorted' Against Mom"*

263.By featuring and hyperlinking to the article within the body of her own publication—and

doing so in a manner that affirmatively directs readers to it as supporting authority—

Defendant effectively endorsed and republished its false and defamatory content. In so

doing, she adopted the article's statements as her own, further disseminating them to her

audience and thereby compounding the injury to Plaintiff. The linked article contains

numerous defamatory and misleading assertions that place Plaintiff in a false light before the

public, including the following:

- *The father did not do much parenting and was frequently absent due to his job.*"

- *"Eventually the kids disclosed abuse by their father: physical, emotional and sexual."*

- *"Judge Jane Grossman found Karen had coached the kids to lie about abuse in order to alienate them from the father. There was zero evidence to support her finding and much evidence to refute it. However, true to the family court agenda to keep men empowered in the family, Judge Grossman ignored the children's disclosures and other supporting facts and evidence and switched custody to the father. And, of course, she allowed him to keep the children away from Karen completely. No supervised visits, no phone calls, nada."*

- *"In April of this year, the three children, now 16, 16, and 13, had had enough of the father's abuse and deprivation of their mother and so they ran away, back to her, where they feel safe, loved and cared for—where they always wanted to be."*

- *"[Judge O'Neill] accepted the father's false allegation that Karen was causing the children to lie about the father's abuse and to not want to live with him."*

- *"The very strong and determined teens decided to leave their mother's house so she wouldn't be arrested."*

## VII. POST-FILING STATEMENTS MADE OR ENDORSED BY DEFENDANT

### September 27, 2025 – GoFundMe and Social Media Endorsements

264. The following statements, made or endorsed by Defendant Tina Swithin through her

fundraising, social-media, and online publications, are false and defamatory and place

Plaintiff in a false light before the public. Each statement was published to a broad online

audience and was intended and understood to portray Plaintiff as corrupt, abusive, and part

of a coordinated effort to harm or silence Defendant and others she claims to represent.

These publications were made with actual malice—that is, with knowledge of their falsity or

with reckless disregard for the truth—and have caused Plaintiff additional severe

reputational, emotional, and personal harm.

265. On or about September 27, 2025, Defendant Swithin endorsed and commented on a publicly

available GoFundMe campaign created to solicit funds for her legal defense in this lawsuit.

The page, which Defendant specifically endorsed and promoted, states in part:

266. "*Tina is facing a million-dollar lawsuit designed to silence her and erase her voice from the movement she built. Powerful groups that profit from family-court chaos are targeting her, hoping to destroy her work and intimidate others who speak out. If they succeed, it's not just Tina who will be silenced—it's every protective parent and child she has fought for, and all those yet to face the family-court system. Immediate funds are needed … [to] stand up to bullies and injustice—especially when children are at risk.*"
(*One Mom's Battle/Tina Swithin GoFundMe page, Sept. 27, 2025.*)

267. On that same page, Defendant personally wrote the following about Plaintiff and this lawsuit: "*It is more than a lawsuit; it is a coordinated campaign of harassment … that has left me concerned for my safety … [T]hey are malicious attacks that cross legal lines, and I am exploring every avenue of accountability.*"
(*Id.*)

268. Defendant reposted and amplified these statements on her *One Mom's Battle* Facebook and

Instagram pages, encouraging her followers to share and donate.

269. Defendant's false and baseless assertions that Plaintiff is aligned with "*powerful groups,*" that he "*coordinated*" a "*campaign of harassment,*" and that his actions constitute "*malicious attacks that cross legal lines*" were intended and understood to portray Plaintiff as part of a corrupt and abusive network seeking to intimidate and harm "protective mothers." These statements are false, defamatory, and highly offensive, and they have incited Defendant's followers to publish vicious threats against Plaintiff and to further disseminate her narrative portraying him as a child sexual abuser who isolated and emotionally harmed his children, stalked his ex-wife, and conspired with family-court professionals to manipulate judicial outcomes.

270. These intentionally inflammatory statements have foreseeably provoked further public

hostility and ridicule toward Plaintiff and caused him severe reputational, emotional, and

personal harm.

### October 2025 – Publications Featuring Plaintiff's Daughter

271. In October 2025, Defendant Swithin featured, promoted, and hyperlinked on her social-media platforms to a video "interview" of Plaintiff's daughter. The daughter—who Swithin knows multiple courts have found to be under the coercive influence of her mother, who is also Defendant's client—repeats long-discredited allegations of abuse against Plaintiff, including that he *"sexually, verbally, and emotionally abused"* her and her brothers, *"wouldn't let [the children] talk to family and friends,"* and *"took their phones for a year."*

272. The video promoted and endorsed by Defendant also asserts that Plaintiff was *"diagnosed as a psychopath"* and that he *"manipulated the police, especially [Police Chief] Jack Drumm,"* as well as the *"guardian ad litem… custody evaluator… and judges including Judge Grossman and Thomas J. O'Neill…"*

273. By republishing and promoting these statements, Defendant amplified her recurring

conspiracy theory that child-protective services, law enforcement, and the judiciary collude

with parents accused of alienation—thereby portraying Plaintiff as a corrupt actor who has

weaponized public institutions for personal gain at the expense of his children.

274. As Defendant is aware, multiple courts have found these claims false; therefore, they are

knowingly defamatory and further cast Plaintiff in a false light by associating him with

criminal and unethical conduct. Defendant's actions have foreseeably caused additional

reputational damage, emotional distress, and personal harm to Plaintiff.

275. The video Defendant hyperlinked on her social-media account is hosted on the YouTube

channel and Substack pages of Richard Luthmann, a convicted felon only recently released

from federal prison for extortion and fraud, and another aspiring "journalist;" both close associates of Plaintiff's deeply troubled ex-wife.

276. Luthmann has a documented record of defaming and threatening Plaintiff with physical violence.

277. Through the foregoing statements and publications, Defendant Swithin has repeatedly and knowingly disseminated false information about Plaintiff, with actual malice, for the purpose of discrediting him publicly, inflaming her followers, and enhancing her personal brand and fundraising efforts.

## COUNT I – INVASION OF PRIVACY (FALSE LIGHT)

278. Ambrose repeats and realleges the foregoing paragraphs as if fully set forth herein.

279. Ambrose is a private individual and is not a public official or public figure.

280. Swithin's publication online was accessed by individuals in Connecticut, throughout the United States, and worldwide.

281. As a result, Ambrose has been subjected to public hatred, ridicule, harassment, disgrace, and threats of violence, causing severe emotional, reputational, and personal harm.

282. Under Connecticut law, false-light invasion of privacy requires proof that:

1. The defendant publicized information placing the plaintiff in a false light that would be highly offensive to a reasonable person; and

2. The defendant knew of or acted with reckless disregard as to the falsity of the publicized matter.

**Defendant's Conduct, as alleged above:**

- Defendant Swithin published false, misleading, and disparaging statements about Ambrose in an article she authored, and in third-party articles she endorsed or republished on her website.

- She also published private information in a way that misrepresented Ambrose, placing him in a misleading and offensive light.

- Swithin knew, or recklessly disregarded, the falsity of these statements and the false light in which Ambrose would be cast.

- Her publications constituted substantial misrepresentations of Ambrose's character and conduct, such that a reasonable person would find the false light highly offensive.

- Ambrose is a private individual—not a public official or public figure.

- The publications were accessible to individuals in Connecticut, throughout the United States, and worldwide.

- As a result, Ambrose has been subjected to public hatred, ridicule, harassment, disgrace, threats of violence, and has suffered severe emotional, reputational, and personal harm.

## COUNT II – PUBLIC DISCLOSURE OF PRIVATE FACTS

Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

Under Connecticut law, public disclosure of private facts requires proof that:

1. The defendant publicized a matter concerning the private life of another;

2. The matter would be highly offensive to a reasonable person; and

3. The matter is not of legitimate public concern—even true facts may be actionable if highly offensive and not of public concern.

**Defendant's Conduct, as alleged above:**

- Swithin published articles and hyperlinks revealing private details about Ambrose's personal life, family relationships, divorce proceedings, and other confidential matters.

- These disclosures included highly confidential records and were not matters of legitimate public concern, but were disseminated to embarrass, harass, and injure Ambrose, a private individual.

- Even if some facts were accurate, the intimate nature of the disclosures rendered them highly offensive to a reasonable person.

- Swithin acted intentionally, willfully, and maliciously, with knowledge or reckless disregard for the humiliation, distress, and injury that would result.

- As a direct and proximate result, Ambrose has suffered severe emotional distress, reputational injury, and other actual damages.

## COUNT III – DEFAMATION PER SE

Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

Under Connecticut law, defamation per se involves statements that are so inherently harmful that damages are presumed—such as imputations of moral turpitude (such as child abuse) or criminal conduct (such as bribery or corruption).

**Defendant's Conduct, as alleged above:**

- Swithin published and/or republished false statements accusing Ambrose of, among other things:

  o Sexually, verbally, and emotionally abusing his children;

  o "Eliminating" family and friends from the children's lives, severely affecting their physical and mental health;

  o Isolating, degrading, micromanaging, manipulating, stalking, sexually coercing, threatening, and punishing his children for three years; purported "proof" notwithstanding;

- Abusing and stalking his ex-wife so intensively that she required a confidential address, including treatment described as "unrelenting harassment" and multiple false claims about her fitness as a mother;

- Conspiring with judges, state agencies, custody evaluators, a guardian ad litem, and reunification specialists—allegedly chosen over his ex-wife's objections—to unlawfully gain or regain custody of his children;

- Privately paying professionals involved in the case to control their testimony;

- Lying under oath in court and to child protective services and law enforcement.

- These statements are false, highly defamatory, and were published with actual malice—knowing of their falsity or acting with reckless disregard for the truth.

- These constitute defamation per se, entitling Ambrose to presumed damages as well as actual damages.

## COUNT IV – DEFAMATION (GENERAL)

Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

Connecticut defamation law requires:

1. A false statement about the plaintiff;

2. That the statement was published to a third party;

3.    That it identified the plaintiff;

4.    And that it harmed the plaintiff's reputation.

**Defendant's Conduct, as alleged above:**

- Swithin published, endorsed, and/or hyperlinked false or misleading statements about Christopher Ambrose.

- She did so with knowledge of their falsity, reckless disregard for the truth, or negligence.

- Her conduct was intentional, willful, or malicious, knowing or recklessly disregarding that it would cause emotional and reputational harm.

- These statements identified Ambrose and subjected him to public hatred, ridicule, contempt, distrust, harassment, disgrace, and potential violence, seriously damaging his personal and professional reputation.

### COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

Connecticut law holds that IIED requires proof that:

1.    The defendant intended to cause emotional distress, or knew or should have known it was likely;

2.    The defendant's conduct was extreme and outrageous;

3.    The conduct caused emotional distress; and

4.    The emotional distress was severe.

**Defendant's Conduct, as alleged above:**

- Swithin's publication and dissemination of highly inflammatory and false statements about Ambrose to a global audience, including to his home state, constituted conduct that was extreme and outrageous, beyond what civilized society tolerates.

- Her actions were intentional, willful, malicious, or carried out with reckless disregard for the likelihood of causing emotional harm.

- As a direct and proximate result, Ambrose has suffered—and continues to suffer—humiliation, mental anguish, shame, distress, and serious emotional injuries.

- Ambrose is entitled to compensatory, special, and punitive damages to be determined at trial.

## COUNT VI – HARASSMENT AND REQUEST FOR INJUNCTIVE RELIEF

Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

- Swithin has engaged in a malicious course of conduct intended to harass and emotionally injure Ambrose by publishing and republishing false, malicious, and defamatory content on digital platforms accessible to Ambrose and the public.

- This conduct aligns with criminal harassment under Connecticut General Statutes § 53a-183(a), which prohibits electronic communication meant to harass, terrorize, or alarm another person, absent legitimate purpose. Harm is recognized both at origin and reception.

- Although Ambrose does not seek criminal prosecution, this persistent conduct inflicts irreparable harm and justifies the issuance of a permanent injunction to halt Swithin's harassment.

- Ambrose has a substantial likelihood of success on the merits of his claims (false light, defamation, IIED).

- The balance of hardships favors Ambrose: continued harassment inflicts greater harm than any burden on Swithin, and the public interest supports protecting private individuals—especially children and families—from targeted online abuse.

- No adequate remedy at law exists; injunctive relief is necessary to prevent further irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Christopher Ambrose respectfully requests that this Court enter judgment in his favor and grant the following relief:

1. **Preliminary and Permanent Injunctions**, as the Court deems appropriate, specifically restraining Defendant Tina Swithin from:

- Engaging in any acts of harassment against Ambrose;

- Publishing or republishing, directly or indirectly (including through third parties), any statements regarding Ambrose on any website(s), platform(s), forum(s), or podcast(s) that she controls;

- Granting any additional equitable relief necessary to protect Ambrose.

2. **An Order compelling immediate removal** by Swithin of all content—statements, comments, writings, photographs, videos, and audio recordings—referencing Ambrose from any medium under her control.

3. **An Order requiring full and prominent retractions**, on onemomsbattle.com and any other platform where the original defamatory or false-light statements appeared, including but not limited to those:

- Alleging Ambrose abused his children in various ways (emotional, sexual, psychological, verbal);

- Portraying Ambrose as isolating, degrading, micromanaging, manipulating, stalking, coercing, or threatening his children;

- Claiming Ambrose prevented his children from visiting friends or Riordan's extended family;

- Accusing Ambrose of abusing his ex-wife (through litigation, stalking, or misrepresentation in court) or preventing her from seeing the children;

- o   Asserting Ambrose abused the legal system or doctrines or conspired with various professionals (judges, GAL, custody evaluators, therapists, etc.) to secure and retain custody.

These retractions must be equally visible, unqualified as the original statements, and cannot be framed as compelled by litigation or mitigation or state that Ambrose denied them. They must fully acknowledge the falsity and harm of Swithin's original statements.

4.  **An order requiring a written public apology** to Ambrose and his children, acknowledging the harm Swithin's false statements caused. This apology must be published on *onemomsbattle.com* with visibility and prominence comparable to the original defamatory content, unqualified, and cannot be framed as compelled by litigation or mitigation or state that Ambrose denied them.

5.  **An award of compensatory and punitive damages**, in an amount **not less than $1,500,000.00**. Plaintiff seeks additional compensatory and punitive damages arising from Defendant's post-filing defamatory statements and republications.

6.  **An award of litigation costs**, including filing fees and service-of-process expenses.

7.  **An award of pre-judgment and post-judgment interest**, as permitted by law.

8.  **Such other and further relief** as the Court deems just and equitable.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff Christopher Ambrose respectfully requests trial by jury as to all issues and claims so triable.

Dated:  10 October 2025

Respectfully submitted,

*Christopher A. Ambrose*

Christopher A. Ambrose, *Pro Se*
153 Middle Beach Rd.
Madison, CT 06443
203.505.1889
ca0515@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, a true and correct copy of the foregoing First Amended Complaint was delivered to Defendant Tina Swithin by electronic mail and by U.S. Mail, first-class postage prepaid, addressed as follows:

Tina Swithin
3906 Hollyhock Way, San Luis Obispo, CA 93401
Email: Tina@tinaswithin.com

Dated: October 10, 2025

Respectfully submitted,

*Christopher A. Ambrose*
Christopher Ambrose
Plaintiff, *Pro Se*
153 Middle Beach Rd.
Madison, CT 06443
203.505.1889
ca0515@aol.com
