# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

**CHRISTOPHER AMBROSE**,                    **Case No. 3:25-cv-01372**
**Plaintiff**
**v.**
**TINA SWITHIN,**                                        **JURY TRIAL DEMANDED**
**Defendant**

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## I. INTRODUCTION

Defendant Tina Swithin's 37-page motion to dismiss rests on a fundamentally distorted premise: that Connecticut courts lack personal jurisdiction simply because Plaintiff asserts defamation claims. But the analysis does not begin—or end—with § 52-59b(a)(2) or (a)(3)'s defamation carve-out. It begins with § 52-59b(a)(1), which authorizes jurisdiction over any nonresident who "transacts any business within the state." Defendant unquestionably did. She was hired as a "divorce coach" by a Connecticut resident, communicated with Connecticut participants in an active Connecticut family-court case, and published knowingly false statements about a Connecticut resident aimed at Connecticut proceedings, Connecticut judges, Connecticut agencies, and Connecticut readers that caused harm in Connecticut to a Connecticut resident. Connecticut courts have consistently held that *even a single purposeful business transaction satisfies § 52-59b(a)(1)*—and Defendant's professional relationship with Plaintiff's ex-wife and her targeted conduct exceed that standard by orders of magnitude.

Defendant's statements forming the basis for this action were published in a *nine-page article*—which she minimizes as a mere "blogpost"—on her One Mom's Battle (OMB) website,

onemomsbattle.com. But OMB is far more than a blog. It is a global commercial enterprise

claiming to have 250,000 followers with multiple revenue-generating components, including

selling merchandise (clothing, "gear," and books she authored for children and adults), private

coaching sessions for mothers in custody disputes, educational classes, workshops, even a

"divorce coach certification program." It is unclear what authority Defendant possesses to issue

such a certification. On information and belief, she has none, and the program appears

comparable to the novelty certificates parents can purchase for young children who have

mastered basic tasks such as tying their shoes or brushing their teeth.

Beyond her website, Defendant operates OMB online support groups listing chapters in all 50

states and Puerto Rico. According to its FaceBook page, the Connecticut chapter alone has 36

members, and Defendant is listed as its administrator. She also runs six international chapters and

a separate chapter dedicated to "Dads of OMB." Her commercial OMB activities are further

amplified under the "Lemonade Gang" and "Tina Swithin Divorcing a Narcissist" branding

across major social-media platforms, including Facebook (132,000 followers), Instagram,

TikTok, X (formerly Twitter), LinkedIn, and others. Her YouTube channel has 17,400 subscribers

and 178 videos. Defendant has publicly discussed this case in videos on YouTube and TikTok

and in posts on Instagram, Facebook, X, and her OMB website. Despite the breadth of this

interstate business enterprise, Defendant launched a GoFundMe campaign soliciting financial

support to cover her legal fees from her followers—many of whom are single mothers—further

underscoring her commercial operations and deliberate cultivation of an interstate audience.

Even setting § 52-59b(a)(1) aside—which is more than sufficient—Plaintiff's non-defamation claims (false light, public disclosure of private facts, intentional infliction of emotional distress, and harassment) are credibly pleaded and independently satisfy § 52-59b(a)(2). Defendant's Motion largely ignores these claims, relying instead on the narrow defamation exclusion applicable only to two counts. It also disregards well-established due-process principles under *Calder v. Jones* and the *Zippo* sliding-scale analysis, both of which apply squarely to Defendant's interactive, commercial online operations and her deliberate targeting of Plaintiff and the Connecticut audience.

Defendant's article was not the product of journalism, investigation, or good-faith error. Rather, it was constructed from sources Defendant knew—or recklessly disregarded were—demonstrably unreliable. Defendant has acknowledged that her primary source was Plaintiff's ex-wife, Karen Riordan ("Riordan"), a litigant whom multiple Connecticut courts have severely sanctioned for repeated and egregious misrepresentations concerning Plaintiff over years of litigation, including findings that she coached and coerced the parties' children to repeat false abuse allegations. Defendant also relied on statements attributed to Plaintiff's minor daughter, notwithstanding judicial findings—made after extensive investigations and sworn testimony—that the child's statements reflected this coaching rather than independent recollection.

Defendant further repeated and amplified the assertions of Dr. Bandy Lee, despite knowing or recklessly disregarding that this Court has previously recognized that Dr. Lee's own Yale colleagues raised serious concerns regarding her professional judgment, ethics, and lack of medical knowledge, resulting in her termination from an unpaid academic appointment. Finally, Defendant uncritically adopted and promoted claims advanced by Frank Parlato—a convicted

federal felon and Riordan's romantic partner—who has published more than 250 articles falsely accusing Plaintiff of criminal conduct and is currently a defendant in a separate defamation action pending before this Court. These allegations plausibly establish that Defendant acted with actual malice, or at minimum reckless disregard for the truth, well beyond the threshold required at the pleading stage.

Defendant knowingly chose to publish her article on the eve of a Connecticut hearing in which Plaintiff's ex-wife faced allegations of contempt for violating restraining orders protecting the parties' three children from her coercive control. Though the Connecticut court found the ex-wife in contempt—again confirming the unreliability of the very source on whom Defendant relied — Defendant did not amend a single misrepresentation. *Even after Plaintiff provided actual notice of multiple judicial findings exposing the falsity of the accusations she had repeated, Swithin refused to correct her damning, reputation-destroying lies*. This posture in the face of court determinations, combined with her deliberate timing and calculated effort to influence Connecticut proceedings and inflict maximum reputational, emotional and other harm, is not mere carelessness. It is the definition of reckless disregard for the truth—and *actual malice*.

Nor did Defendant's misconduct end when she was sued. After Plaintiff filed this action, Defendant publicly threatened to publish a new interview with his daughter and continued posting about Plaintiff, suggesting among other things that he was part of a conspiracy against her. These posts incited hostile commentary, including threats, from her more than 250,000 followers, further exacerbating Plaintiff's reputational, emotional, and other harms. Defendant's

relentless campaign of incitement strongly supports the inference that she acted not only recklessly, but with a deliberate intent to injure — malice.

This case is also not about rhetorical opinion. Defendant's nine-page article *asserts as fact* that Plaintiff "perpetrated abuse—verbal, emotional, and sexual—against their three children," "has made countless false claims about Riordan's fitness as a mother," "eliminated" the mother and her family from the children's lives, "manipulated" Connecticut's domestic-violence protections, and "manipulat[ed] Jennifer's Law to perpetuate abuse." She goes on to indicate that Plaintiff colluded with and even paid-off Connecticut authorities and courts. These are not expressions of hyperbole or protected opinion; they are concrete statements of crimes of moral turpitude and other serious wrongdoing. Defendant also: amplified confidential, sealed allegations — all discredited; republished through hyperlink defamatory material published by sources she featured, endorsed, promoted and knew or should have known were unreliable; and republished sensitive, specious information concerning Plaintiff's relationships with his children.

Defendant's business transactions with a Connecticut resident, her Connecticut-centered and directed activities, her published statements about a Connecticut resident and Connecticut court proceedings, her knowing reliance on discredited sources, her disregard of judicial findings of falsity, her timing and amplification of harmful allegations, her refusal to acknowledge falsity, and her continuation of the same misconduct after this lawsuit was filed demonstrate purposeful availment, reckless disregard, actual malice, and actionable misconduct. The Amended Complaint ("AC") more than states plausible claims, and both the long-arm statute and constitutional due process are satisfied.

For these reasons, and those set forth below, the Court should deny Defendant's Motion in its entirety.

## II. PERSONAL JURISDICTION EXISTS UNDER § 52-59b(a)(1)

### A.  Connecticut's Long-Arm Statute Is Interpreted Broadly and Requires Only a Single Purposeful Transaction

Connecticut's long-arm statute authorizes personal jurisdiction over a nonresident who "transacts any business within the state." Conn. Gen. Stat. § 52-59b(a)(1). The Connecticut Supreme Court has established that even a "single purposeful business transaction" may satisfy this requirement. *Zartolas v. Nisenfeld,* 184 Conn. 471, 474 (1981). While the phrase "transacts any business" is construed broadly, it does not reach incidental or attenuated contacts; rather, the inquiry focuses on whether the defendant purposefully engaged in activities directed at Connecticut. *Thomason v. Chemical Bank,* 234 Conn. 281, 291–95 (1995).

In applying § 52-59b(a)(1), courts examine the "totality of the defendant's Connecticut-related conduct," which can include the initiation and maintenance of relationships with Connecticut residents, the nature and frequency of communications into the state, and whether the defendant sought the benefits or protections of Connecticut law. *Cogswell v. American Transit Ins. Co.,* 282 Conn. 505, 523 (2007). Within this framework, a nonresident who purposefully enters into a professional relationship with a Connecticut resident—and directs related activities into the state —may be found to have transacted business under the statute. *Id.*; see also *MacDermid, Inc. v.*

*Deiter*, 702 F.3d 725, 730 (2d Cir. 2012) (recognizing that knowing and intentional electronic activity directed at Connecticut-based infrastructure can satisfy Connecticut's long-arm statute and due-process requirements).

To be clear, while § 52-59b(a)(2) and (3) contain exceptions for defamation claims, subsection (a)(1)—governing the transaction of business—contains no such limitation. Connecticut courts and the Second Circuit have consistently held that a defendant who transacts business in the state is subject to jurisdiction under (a)(1) even if the underlying claim involves defamation. *See, e.g., Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246-48 (2d Cir. 2007) (analyzing jurisdiction for defamation under the "transacting business" prong).

Because § 52-59b(a)(1) is coextensive with the Due Process Clause, the statutory inquiry and the constitutional "minimum contacts" analysis often merge. *Best Van Lines, Inc.,* 490 F.3d at 247-48. Jurisdiction is proper where a defendant has "purposefully availed" themselves of the privilege of conducting activities in Connecticut, such that they should reasonably anticipate being haled into court here. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474-75 (1985). Here, Defendant did far more than engage in isolated or fortuitous contact; she was hired by a Connecticut resident and intentionally directed her commercial enterprise toward Connecticut litigants, controversies, institutions, and residents, as discussed below.

**B. Defendant's Extensive Activities Satisfy the "Transacting Business" Requirement**

Defendant's conduct easily satisfies Conn. Gen. Stat. § 52-59b(a)(1) because she intentionally engaged in conduct designed to generate business and influence proceedings within this state. While Defendant's contacts here are extensive, Connecticut law is clear that even a "single purposeful business transaction" is sufficient to confer jurisdiction. *Zartolas,* 184 Conn. at 474; *Thomason,* 234 Conn. at 291. Any one of the following four categories of activity independently satisfies the statute:

1. **Professional Contractual Relationships:** Defendant entered into a remunerated relationship with a Connecticut resident (Plaintiff's ex-wife) as a "divorce coach" and to influence an active Connecticut court proceeding. This exchange of services for payment is a classic business transaction under *Zartolas.*

2. **Directed Professional Communications:** Defendant initiated and maintained communications with Connecticut participants and witnesses to further her professional objectives. Courts prioritize the "nature and frequency of communications into the state" when examining the totality of conduct. *Cogswell, 282 Conn. at 523.*

3. **Targeted Media and Advocacy:** Defendant crafted content specifically around Connecticut litigants and unique state statutes (e.g., "Jennifer's Law") to influence local controversies. The Second Circuit holds that electronic acts purposefully directed at Connecticut residents satisfy the statute's broad reach. *MacDermid,* 702 F.3d at 730.

4. **Commercial Infrastructure:** Defendant manages a dedicated "Connecticut chapter" of her enterprise and extensively markets merchandise, videos, coaching and certification programs directly to this local audience. This intentional direction of an enterprise into the forum state constitutes transacting business. *Best Van Lines,* 490 F.3d at 247-48.

Whether viewed as a series of independent transactions or as a unified "totality of conduct," Defendant has purposefully availed herself of the Connecticut forum.

**C. Plaintiff's Claims "Arise From" Defendant's Connecticut Business Activity**

To satisfy the long-arm statute, a cause of action must simply "arise from" the defendant's Connecticut business transactions. Conn. Gen. Stat. § 52-59b(a)(1). Connecticut courts apply this

standard broadly and flexibly; it does not require a showing of proximate causation. *Thomason,* 234 Conn. at 295. Instead, the statute requires only a "discernible relationship" between the defendant's Connecticut-directed activities and the specific claims at issue. *Id.* That standard is fully met here. Plaintiff's claims arise directly from a continuous web of forum-directed conduct, including:

- Defendant's remunerated professional relationship with a Connecticut resident established for the express purpose "transacting business" and generating Connecticut-related content;

- Defendant's targeted communications into the state to gather information for that content;

- The publication of an article explicitly referencing Connecticut litigants, officials, institutions, and statutes; and

- Defendant's intentional effort to influence public opinion in Connecticut and the outcome of an ongoing Connecticut legal proceeding.

As Defendant was aware, the "brunt of the injury" from these acts would be suffered in Connecticut. Because the business activities that generated the defamatory statements were rooted in Connecticut controversies and directed at Connecticut residents, this litigation satisfies § 52-59b(a)(1) under any recognized formulation of the "arising from" requirement.

## D. In the Alternative, the Court Should Permit Targeted Jurisdictional Discovery

Even if the Court were to conclude that Plaintiff has not yet established a *prima facie* showing of personal jurisdiction—which the present record amply demonstrates—limited jurisdictional discovery is nevertheless warranted. The Second Circuit has long held that a plaintiff is entitled to jurisdictional discovery where the existing record suggests a "colorable basis" for jurisdiction, or where jurisdictional facts are disputed or lie uniquely within the defendant's possession. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85–86 (2d Cir. 2013); *APWU v.*

*Potter*, 343 F.3d 619, 627 (2d Cir. 2003); *Texas Int'l Magnetics, Inc. v. BASF Aktiengesellschaft*, 31 F. App'x 738, 739 (2d Cir. 2002).

Here, the facts concerning Defendant's Connecticut-directed activities—including her professional relationship with a Connecticut resident, communications with Connecticut residents, OMB chapter operations, Connecticut-focused outreach, audience metrics, and interstate revenue derived from her online enterprise—are matters solely within her control. Jurisdictional discovery would confirm, not undermine, the substantial Connecticut contacts already evident in the record.

Should the Court find any ambiguity regarding factual matters necessary to resolve the jurisdictional question, Plaintiff respectfully requests the opportunity to conduct targeted jurisdictional discovery, including limited document requests, interrogatories, and, if necessary, a short Rule 30(b)(6) deposition.

### III. Alternatively, Jurisdiction Exists Under § 52-59b(a)(2) and (a)(3) for the Non-Defamation Claims

Even if the Court were to conclude that § 52-59b(a)(1) does not independently confer personal jurisdiction over all claims (and the record demonstrates that it does), jurisdiction would still lie under § 52-59b(a)(2) and (a)(3) for Plaintiff's non-defamation causes of action, including false light, public disclosure of private facts, intentional infliction of emotional distress ("IIED"), and harassment. The statutory defamation carve-out applies only to defamation, not to these independent torts.

## A.  Section 52-59b(a)(2) Applies Because Defendant Committed Tortious Acts "Within the State"

Section 52-59b(a)(2) permits personal jurisdiction over a nonresident who "commits a tortious act within the state," except for causes of action for defamation. Connecticut courts have long held that a tortious act occurs "within" the state when a defendant intentionally directs harmful communications—such as emails or online postings—into Connecticut and the resulting injury is felt here.

While the statute contains an exception for defamation, this exception does not automatically bar all claims involving speech. Rather, the relevant inquiry is whether the non-defamatory claims—such as invasion of privacy, IIED, and harassment—arise from independent duties and involve distinct elements and injuries. Unlike a defamation claim, which seeks to redress injury to reputation, these torts address the "intentional and directed" nature of the Defendant's conduct and the resulting emotional and personal harm to a Connecticut resident.

Federal and state authorities support this distinction:

- *Doe v. Ciolli*, 611 F. Supp. 2d 216 (D. Conn. 2009): The court exercised jurisdiction over non-defamation torts—including copyright infringement and privacy claims—even when they were joined with a libel count, because they were based on conduct that was intentionally directed into Connecticut.

- *Oppenheim v. Erwin*, No. CV-00-0441611, 2001 WL 419236 (Conn. Super. Ct. Apr. 10, 2001): The court affirmed that the purposeful transmission of harmful content to a

Connecticut resident constitutes a "tortious act within the state" for jurisdictional purposes under § 52-59b(a)(2).

Although the defense may rely on *Biro v. Hirsch*, 62 Conn. App. 11 (2001) to argue the defamation exception is broad, that case is distinguishable here. In *Biro*, the additional claims were merely "repackaged" defamation counts based on the exact same reputational injury. In contrast, Plaintiff's claims for invasion of privacy, IIED and harassment arise from the Defendant's repeated and targeted efforts to cause emotional distress, separate and apart from whether the statements themselves were technically "defamatory." Because these claims rely on distinct duties to avoid intentional harassment and emotional harm, the statutory exception for defamation does not apply.

Here, Defendant deliberately directed statements into Connecticut, specifically targeting a Connecticut resident and ongoing court proceedings. Because these non-defamatory torts caused independent emotional and personal harm in Connecticut, the Defendant's conduct falls squarely within the scope of § 52-59b(a)(2).

## B. Defendant Also Satisfies § 52-59b(a)(3)

Section 52-59b(a)(3) provides an additional and independent basis for personal jurisdiction for the non defamation claims. The subsection applies where a nonresident (1) commits a tortious act outside Connecticut that causes injury within the state, and (2) "regularly does or solicits business," "engages in any other persistent course of conduct," or "derives substantial revenue from interstate commerce."

**1. Defendant committed tortious acts outside Connecticut causing injury within Connecticut**

Defendant "investigated," wrote, edited, and published the harmful statements at issue from outside Connecticut. Those statements were deliberately transmitted into Connecticut and caused reputational, emotional, relational, and personal injury to a Connecticut resident in Connecticut.

Courts have repeatedly held that out-of-state conduct causing in-state injury satisfies the first prong of § 52-59b(a)(3). See *Milne v. Catuogno*, 239 F. Supp. 2d 195, 204–05 (D. Conn. 2002) ("When out-of-state tortious conduct causes injury within Connecticut, the first prong of § 52-59b(a)(3) is satisfied."); and *David v. Weitzman*, 677 F. Supp. 95, 99 (D. Conn. 1987) ("Where the injury occurs in Connecticut, the first element of § 52-59b(a)(3) is met.").

Defendant's conduct fits comfortably within these holdings.

**2. Defendant Engages in a Persistent Course of Conduct Within Connecticut**

The second prong of General Statutes § 52-59b(a)(3) is independently satisfied because Defendant "regularly does or solicits business" and "engages in a persistent course of conduct" within Connecticut. In determining whether this statutory threshold is met, federal courts applying Connecticut's long-arm statute examine the defendant's forum-directed activities in their totality, considering the nature, quality, and continuity of the conduct directed at the state. See *Amerbelle Corp. v. Hommel*, 272 F. Supp. 2d 189, 192–93 (D. Conn. 2003).Viewed under this totality-of-the-circumstances analysis, Defendant's sustained and purposeful Connecticut-directed activities are more than sufficient to establish jurisdiction under § 52-59b(a)(3).

Defendant's presence in this forum began with a targeted professional engagement. She was hired and compensated by a Connecticut resident—Plaintiff's ex-wife—to provide "divorce coaching" services and to create and promote content specifically concerning an active Connecticut family court dispute. This was not an incidental contact; it was a purposeful business relationship designed to influence Connecticut judicial proceedings and shape public opinion within this state.

Beyond this individual transaction, Defendant maintains a structured and continuous business presence in Connecticut through her OMB enterprise. Defendant operates a dedicated Connecticut chapter of the OMB support group, publicly listing dozens of Connecticut-based members and identifying herself as the chapter's administrator. By maintaining, supervising, and regularly interacting with this Connecticut-based constituency as part of her broader commercial operations, Defendant has established exactly the type of "persistent course of conduct" contemplated by the long-arm statute. This engagement is not "random, isolated, or fortuitous," but is instead a deliberate attempt to cultivate a following and conduct business activities within Connecticut's borders. Courts consistently hold that sustained engagement with Connecticut residents and systems satisfies the "persistent conduct" requirement. In *MacDermid*, 702 F.3d at 730, the Second Circuit affirmed that deliberate, repeated interactions directed at a Connecticut entity with foreseeable in-state consequences constitute a sufficient basis for jurisdiction.

Here, the record demonstrates a continuous pattern of business interactions, advocacy, and service relationships—all purposefully directed at Connecticut residents. Because Defendant has deliberately projected herself into the state to conduct her professional affairs and manage her local organization, she has purposefully availed herself of the benefits and protections of Connecticut law. This pattern of conduct easily qualifies as "persistent" under § 52-59b(a)(3).

### 3. Defendant derives substantial revenue from interstate commerce

Defendant's OMB enterprise generates significant revenue from interstate commerce through paid coaching services, multi-state and international chapters, online workshops, classes, and "certification" programs, nationwide merchandise sales, and donations solicited through large national social-media platforms.

Federal courts construing Conn. Gen. Stat. § 52-59b(a)(3)(B) have recognized that the statute does not require a defendant to derive revenue from Connecticut itself. Rather, the inquiry focuses on whether the defendant derives substantial revenue from interstate or international commerce, reflecting commercial activity that is not purely local in nature. See *Thomason*, 234 F. Supp. 2d at 142–43. This statutory requirement serves to limit the exercise of jurisdiction to defendants whose commercial activities extend beyond a single state, such that it is constitutionally foreseeable they may be required to defend suit outside their home forum. See *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98 (1980).

Because § 52-59b was modeled on New York's long-arm statute, Connecticut courts frequently look to New York authority for guidance in interpreting materially similar provisions. See, e.g.,

*Zartolas v. Nisenfeld*, 184 Conn. 471, 474 (1981) (relying on New York law to interpret the "transacts any business" standard). In *Ingraham v. Carroll*, the New York Court of Appeals explained that the "substantial revenue from interstate commerce" requirement examines the defendant's overall interstate business activities, rather than whether the particular transaction or injury-causing conduct generated revenue from the forum state. 90 N.Y.2d 592, 598–99 (1997).

Here, Defendant's multi-state and online commercial activities plainly generate substantial interstate revenue, satisfying § 52-59b(a)(3)(B) regardless of where any particular sale occurred.

Even if the Court were to conclude—contrary to the record—that Defendant did not "transact business" in Connecticut under § 52-59b(a)(1), personal jurisdiction is independently proper under § 52-59b(a)(3). Defendant committed tortious acts outside Connecticut causing injury within the state, engaged in persistent Connecticut-directed conduct, and derived substantial revenue from interstate commerce. Jurisdiction is therefore proper under § 52-59b(a)(3) for all non-defamation claims.

**Summary of Statutory Personal Jurisdiction**

In summary, *Conn. Gen. Stat. § 52-59b(a)(1) provides a sound and independent basis for personal jurisdiction over all claims asserted in this action, including defamation*. Connecticut courts construe § 52-59b(a)(1) broadly, requiring only that the cause of action arise out of or relate to the defendant's transaction of business within the state, and recognizing that the statute is not limited to contract claims but extends to tort claims arising from purposeful forum-directed activity. See *Zartolas*, 184 Conn. 471 (1981).

The non-defamation claims—including false light, public disclosure of private facts, and IIED—are additionally supported by § 52-59b(a)(2) and § 52-59b(a)(3), each of which independently authorizes jurisdiction based on Defendant's tortious conduct and its foreseeable consequences within Connecticut. Because jurisdiction over the defamation claim is properly grounded in subsection (a)(1), and because that claim arises directly from Defendant's Connecticut-related business transactions, the statutory defamation exclusion contained in § 52-59b(a)(2) poses no bar to jurisdiction in this case. The subsections of the long-arm statute operate independently, and the defamation carve-out does not restrict jurisdiction otherwise available under § 52-59b(a)(1). See *Knipple v. Viking Communications, Ltd.*, 236 Conn. 602, 674 A.2d 426 (1996).

Federal courts applying Connecticut law have likewise recognized that purposeful, forum-directed conduct—including publication activity and other intentional acts targeting Connecticut residents—may constitute the transaction of business within the meaning of § 52-59b(a)(1), even in the absence of physical presence in the state. See *Best Van Lines, Inc.*, 490 F.3d at 252–53.

Read as a whole, Connecticut's long-arm statute provides a complete and coherent jurisdictional foundation for all causes of action alleged in the Complaint.

## IV. DUE PROCESS IS SATISFIED UNDER *CALDER v. JONES*

Even if the Court concludes that the Connecticut long-arm statute is satisfied (and the current record demonstrates that it is), the exercise of personal jurisdiction must also comport with constitutional due process. Under the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984), due process permits personal jurisdiction where a defendant intentionally directs her conduct at the forum state and the plaintiff suffers the brunt of the injury there. Courts in the

Second Circuit consistently apply *Calder*'s "effects test" to online publications, out-of-state defendants, and remote conduct intentionally aimed at the forum state. *See Ciolli*, 611 F. Supp. 2d at 222. Here, Defendant's conduct easily satisfies each element of the *Calder* "effects test."

## A. Defendant's Conduct Was Intentional and Directed Toward Connecticut

Defendant's actions were not accidental, incidental, or passively accessible online content. She intentionally targeted a Connecticut resident and purposely inserted herself into active Connecticut family-court proceedings. Defendant published a nine-page article built entirely around Connecticut litigants, witnesses, attorneys, judges, Connecticut agencies, institutions and courts, and Connecticut investigations, rulings and statutes. She relied on Connecticut-based sources and communications and timed her publication to coincide with an imminent Connecticut contempt hearing. These were deliberate editorial choices designed to influence the proceedings and inflame perceptions within this forum.

Under *Calder*, intentionally directing harmful conduct at the forum state—particularly concerning the forum's residents, courts, and judicial proceedings—is sufficient to establish express aiming for constitutional purposes. See *Calder*, 465 U.S. at 789–90 (finding jurisdiction proper because the defendants knew their article would have a potentially devastating impact on the plaintiff's career in California); *Ciolli*, 611 F. Supp. 2d at 222 (exercising jurisdiction over non-defamation torts where online postings were "expressly aimed" at Connecticut and caused injury here).

## B. The Brunt of the Harm Was Felt in Connecticut

The injuries caused by Defendant's conduct were suffered squarely in Connecticut, as she intended. Plaintiff is a long-time Connecticut resident. His reputation, community standing, familial and personal relationships, and emotional well-being were harmed here. Defendant's false statements concerned Plaintiff's alleged violent, criminal conduct, corrupt behavior in Connecticut legal proceedings, and even his parenting—injuries that necessarily took effect in the state where Plaintiff lives, works, litigates, and maintains parental responsibilities.

The Supreme Court has made clear that where a defendant intentionally aims conduct at a forum resident, and the reputational, emotional and other harm is experienced in that forum, the "effects" requirement is met. *Calder*, 465 U.S. at 789–90. The Connecticut Superior Court has affirmed this principle, holding that a tortious act occurs where the harmful communication is received and acted upon (in Connecticut), establishing the locus of injury in the forum state. See *Oppenheim*, No. CV-00-0441611, 2001 WL 419236, at *3. Plaintiff's Connecticut-based injuries fall squarely within this framework.

## C. Defendant's Conduct Was Expressly Aimed at This Forum

This is not a case involving generalized national "reporting" or commentary. Defendant's publication was aimed directly at Connecticut. Her article repeatedly references Connecticut judges, Connecticut statutes, Connecticut proceedings, Connecticut family-court controversies, and Connecticut attorneys, witnesses and litigants—including Plaintiff. Her article was even timed to have maximum impact on Connecticut judicial proceedings. Her OMB enterprise also markets merchandise and services to a Connecticut audience, and maintains a Connecticut

chapter with dozens of Connecticut members, which she personally oversees, a fact that underscores Defendant's ongoing, structured engagement with this forum.

Courts applying *Calder* routinely hold that targeted online content referencing forum-specific legal controversies and directed toward forum residents satisfies the "express aiming" requirement. *See Ciolli, 611 F. Supp. 2d at 222*. Defendant's Connecticut-centric reporting— framed around Connecticut custody litigation and designed to influence Connecticut court proceedings and public perception—plainly meets this standard.

**D. Exercising Jurisdiction Is Consistent With Fair Play and Substantial Justice**

The due-process inquiry also requires that exercising jurisdiction be consistent with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). All relevant factors favor jurisdiction here.

Defendant operates a nationwide, highly interactive web-based platform across multiple websites and social-media channels. She markets services, educational programs, merchandise, and advocacy materials to consumers throughout the United States, including Connecticut. She maintains an active Connecticut OMB chapter and regularly interacts with Connecticut followers. Defendant cannot credibly claim surprise at being haled into a Connecticut court after deliberately directing harmful conduct at a Connecticut resident and at ongoing Connecticut judicial proceedings.

Connecticut also has a compelling sovereign interest in adjudicating claims involving defamatory or tortious conduct targeted at its residents, its courts, and its legal system. It would be inefficient and unjust to require Plaintiff to litigate such claims in a distant forum when the harm occurred here and the conduct was aimed here.

## V. DEFENDANT'S ONLINE OPERATIONS SATISFY THE *ZIPPO* SLIDING-SCALE TEST AND FURTHER ESTABLISH PURPOSEFUL AVAILMENT

Courts frequently evaluate Internet-based jurisdiction under the *Zippo* sliding-scale framework alongside *Calder*'s effects test. See *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1123–26 (W.D. Pa. 1997). Under *Zippo*, personal jurisdiction is proper where a defendant operates an interactive, commercial online presence through which she purposefully conducts business with forum users. The Second Circuit's due-process analysis likewise focuses on purposeful availment and targeting—not mere website accessibility. See, e.g., *Best Van Lines, Inc. at* 252–53 (mere accessibility is insufficient; forum-directed conduct matters); *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171–72 (2d Cir. 2010) (Internet sales and solicitation reflecting forum targeting support jurisdiction); *MacDermid, Inc.*, 702 F.3d at 730–31 (purposeful use of Internet to cause effects in Connecticut sufficient for due process).

### A. Defendant's Online Presence Is Highly Interactive and Commercial

Defendant's OMB website and coordinated social-media channels are not passive pages; they are interactive, transaction-enabling platforms. Defendant solicits and publishes reader comments; encourages tips, submissions, and continuing engagement; promotes and sells coaching services,

workshops, and online programs; markets merchandise; and solicits donations from followers. This is precisely the kind of commercial, two-way Internet conduct that *Zippo* places at the "active" end of the spectrum and that Second Circuit precedent recognizes as purposeful forum engagement. See *Zippo*, 952 F. Supp. at 1124; *Chloé*, 616 F.3d at 171–72.

**B. Defendant Purposefully Targeted an Interstate—Including Connecticut—Audience**

Defendant did not merely engage with Connecticut incidentally, she systematically targeted Connecticut itself. Her conduct centers on Connecticut-specific court proceedings, protective orders, statutes, agencies, and institutions, and repeatedly names Connecticut judges, litigants, attorneys, and witnesses. She affirmatively operates and administers a Connecticut-based OMB chapter comprising 36 Connecticut members—an organized, ongoing forum through which she cultivates, solicits, and serves a Connecticut audience. This is not a passive website or generalized commentary accessible nationwide, but deliberate, sustained, and structured Connecticut-facing conduct, undertaken with full awareness of its forum-specific impact. By exploiting a Connecticut-based controversy and fostering direct engagement with Connecticut residents, Defendant purposefully availed herself of the benefits and protections of the Connecticut forum. Such conduct easily satisfies purposeful availment under both the *Zippo* framework and Second Circuit due-process principles. See *Best Van Lines*, 490 F.3d at 252–53; *MacDermid*, 702 F.3d at 730–31. This case sits at the core—not the margins—of constitutionally permissible forum jurisdiction.

**C. The *Zippo* and *Calder* Analyses Reinforce One Another**

Defendant's deliberate, commercial, and interactive online enterprise, coupled with her express

aiming at Connecticut controversies and audiences, confirms purposeful availment under the Due

Process Clause. *Zippo* establishes that her platforms enable two-way commercial engagement;

*Calder* confirms that she intentionally directed harmful content at a Connecticut resident and

knew the brunt of the harm would be felt in the state. Together, these doctrines underscore that

exercising jurisdiction comports with "fair play and substantial justice." See *Int'l Shoe*, 326 U.S.

at 316 (1945).

## VI. THE COMPLAINT STATES PLAUSIBLE CLAIMS UNDER RULE 12(b)(2) and RULE 12(b)(6)

### A. Rule 12(b)(2): Plaintiff Need Only Make a *Prima Facie* Showing of Personal Jurisdiction

On a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction, the plaintiff bears

the burden of making a *prima facie* showing that the court has jurisdiction over the defendant.

*Chloé*, 616 F.3d at 163. To satisfy this burden at the pleading stage, the plaintiff must allege facts

which, if credited, are "legally sufficient to establish jurisdiction." *DiStefano v. Carozzi N. Am.,*

*Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).

In evaluating a Rule 12(b)(2) challenge, the Court must: construe all jurisdictional allegations in

the light most favorable to the plaintiff; resolve all factual disputes in the plaintiff's favor; and

may consider materials outside the pleadings, including affidavits, documents, and other

evidence. *See Dorchester Fin. Sec., Inc.*, 722 F.3d at 85–86. A plaintiff's *prima facie* burden is

"modest," and dismissal is inappropriate where the plaintiff has made a colorable showing of

jurisdiction. *Chloé*, 616 F.3d at 163–64. As demonstrated below, Plaintiff easily meets this burden under Rule 12(b)(2).

**B. Rule 12(b)(6): The Complaint Need Only Allege Plausible Claims**

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the factual allegations permit a reasonable inference of liability; a complaint cannot be dismissed simply because the plaintiff may ultimately not prevail. *Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. at 678.

At this stage, the Court must: (1) accept all well-pleaded facts as true; (2) draw all reasonable inferences in Plaintiff's favor; and (3) refrain from weighing evidence or resolving factual disputes. *Lundy v. Catholic Health Sys.*, 711 F.3d 106, 113 (2d Cir. 2013).

When read together, *Twombly*, *Iqbal*, and *Lundy* underscore the limited nature of Rule 12(b)(6) review and the high bar a defendant must meet to obtain dismissal at the pleading stage. Plaintiff is not required to prove falsity, intent, or malice at this juncture.

Plaintiff identifies numerous specific false statements; alleges when, where, and how Defendant published them; and provides detailed facts demonstrating their falsity—all of which easily satisfy the plausibility standard. The AC sets forth extensive factual allegations demonstrating Defendant's knowing or reckless publication of false statements, her reliance on discredited sources, and her disregard of investigations by public authorities and even judicial findings.

Plaintiff also alleges substantial reputational, emotional, and other harm suffered in Connecticut. Several of the statements constitute defamation *per se*, rendering damages presumed. The AC comfortably satisfies—and indeed exceeds—the requirements of Rule 12(b)(6).

**A. Defamation and Defamation *Per Se***

To survive dismissal, Plaintiff need only allege facts that plausibly establish the elements of defamation under Connecticut law. He has done far more than that.

**1. Defendant Published False Statements of Fact**

The AC identifies numerous specific statements published by Defendant that were presented as factual assertions—not opinion—including claims that Plaintiff: committed sexual, emotional, and verbal abuse against his children; mistreated and terrorized his ex-wife; manipulated Connecticut domestic-violence laws, including improperly invoking Jennifer's Law; eliminated the children's mother and maternal extended family; and engaged in misconduct and corruption in Connecticut courts.

Under Connecticut law, whether a statement is actionable turns on whether a reasonable reader would understand it as asserting or implying facts capable of being proven true or false. *Goodrich v. Waterbury Republican-Am., Inc.*, 188 Conn. 107, 111–12 (1982). Context matters. *Id.* Here, Defendant's nine-page article was framed as thorough reporting, relied on identified sources, referenced court proceedings, and accused Plaintiff of concrete wrongdoing. These are

classic factual assertions, not rhetorical hyperbole or protected opinion. See *Miles v. Perry*, 11 Conn. App. 584, 595–98 (1987). [1]

Plaintiff alleges detailed facts demonstrating the falsity of these statements, including contrary judicial findings, documentary evidence, and the unreliability of Defendant's sources. At the pleading stage, these allegations must be accepted as true.

## 2. The Statements Are Defamatory *Per Se*

Many of Defendant's statements are defamatory *per se*. Connecticut recognizes defamation *per se* where a publication imputes criminal conduct, particularly crimes involving moral turpitude or an "infamous" penalty, or professional or ethical misconduct. *Torosyan v. Boehringer Ingelheim Pharms., Inc.*, 234 Conn. 1, 27–28 (1995); *Gambardella v. Apple Health Care, Inc.*, 86 Conn. App. 842, 850–51 (2005).

Accusations that Plaintiff sexually, emotionally, and verbally abused his children, emotionally terrorized his ex-wife, bribed or manipulated courts, and committed fraud on Connecticut institutions fall squarely within these categories. Because such statements are defamatory on their face, damages are presumed and need not be specially pleaded. *Torosyan*, 234 Conn. at 28.

## 3. The Complaint Plausibly Alleges Fault—Including Actual Malice

---

[1] To the extent Defendant contends that certain defamatory statements are non-actionable because Plaintiff was not identified by name, Connecticut law is to the contrary. A plaintiff need not be expressly named so long as the publication would reasonably be understood by its audience to refer to him. See, e.g., *QSP, Inc. v. Aetna Cas. & Sur. Co.*, 256 Conn. 343, 352–53 (2001). Here, Defendant explicitly referenced the defamation action she publicized, linked to videos identifying Plaintiff by name, and made the referent unmistakable to the relevant audience.

Plaintiff is a private figure and therefore need only plead negligence to state a *prima facie*

defamation claim. Nonetheless, the Amended Complaint plausibly alleges actual malice, further

foreclosing dismissal.

Defendant's reliance on sources she knew—or at minimum should have known—were

profoundly unreliable demonstrates reckless disregard for the truth. Specifically, Defendant

relied on Plaintiff's ex-wife, whose history of egregious misrepresentations has been documented

in multiple public judicial findings and for which she has been judicially sanctioned; Plaintiff's

minor daughter, whom courts have found was coached and controlled by her mother in a manner

that undermined the reliability of her statements; Dr. Bandy Lee, whose termination followed

widespread and publicly documented concerns regarding her professional judgment and ethics—

facts already recognized by this Court and reported in the mainstream press; and Frank Parlato, a

convicted federal felon, the romantic partner of Plaintiff's ex-wife, and a defendant in a related

defamation action currently pending before this Court.

Defendant's "purposeful avoidance of the truth" is further evidenced by the timing of the

publication to coincide with a Connecticut contempt hearing and her refusal to correct the

article's demonstrable falsehoods even after being provided with judicial findings that directly

contradicted her claims. *See Goodrich*, 188 Conn. at 118 (holding that reckless disregard is

established by a "purposeful avoidance of the truth").


Finally, Defendant's continued posts about Plaintiff *after* the filing of this lawsuit—designed to

intimidate and amplify and incite additional harm—bolsters a strong inference of actual malice.

At the pleading stage, where the Court must resolve all inferences in the Plaintiff's favor, these allegations are more than sufficient.

**4. Republication of Defamatory Statements**

Defendant contends that she is not accountable for defamatory statements to which she hyperlinks. Courts in the Second Circuit have generally held that a mere hyperlink, without more, does not constitute republication for defamation purposes. However, federal courts have made clear that this principle applies only to passive linking, and not where a defendant incorporates, adopts, or substantively relies upon the linked material as part of a new publication. In *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, the court explained that when a defendant uses linked material as part of an "aggregate publication" to advance her own narrative, such conduct may move beyond neutral reference and into the realm of republication. 194 F. Supp. 3d 263, 282–83 (S.D.N.Y. 2016).

Here, Defendant did far more than merely provide a hyperlink. She linked to statements made by Bandy Lee, affirmatively endorsed those statements, and integrated them into her own accusatory narrative. Defendant added explanatory context, relied on Lee's assertions to support her claims, and explicitly presented Lee to readers as "a Yale- and Harvard-trained psychiatrist and world-renowned expert on violence," thereby vouching for Lee's credibility and signaling that Lee's statements should be credited and adopted as fact. These allegations plausibly support republication, not passive linking, and are more than sufficient at the pleading stage. In any event, Plaintiff's claims do not hinge on hyperlinking, as the majority of the challenged statements were authored and published directly by Defendant herself.

**B. False Light**

Connecticut recognizes a cause of action for false light invasion of privacy where a defendant gives publicity to a matter concerning another that places the person before the public in a false light that would be highly offensive to a reasonable person, and where the defendant acted with knowledge of or reckless disregard as to the falsity of the publicized matter. See *Goodrich* 188 Conn. at 131–32 (1982).

The AC plausibly alleges each element. Defendant publicized a sweeping, misleading narrative portraying Plaintiff as dangerous — a sexual predator of his children, verbal and emotional abuser of his family, manipulator of Connecticut law, and corrupter of judicial processes—all claims that courts have rejected as false. Defendant's presentation went well beyond reporting discrete facts; it constructed a cohesive storyline that recast Plaintiff's conduct, motives, and character in a grossly distorted and highly offensive manner.

Defendant's conduct satisfies the publicity requirement. The article was disseminated through Defendant's website and social-media channels, amplified to her OMB audience of 250,000 followers and available online to the world, and repeatedly referenced and promoted. The allegations plausibly show that Defendant knew the portrayal was false or, at minimum, acted with reckless disregard for the truth by relying on demonstrably unreliable sources, ignoring contrary judicial findings, refusing to correct after notice, and continuing to promote the narrative after suit was filed.

These allegations readily state a claim for false light, especially at the pleading stage. Defendant's arguments collapse false light into defamation and ignore that Connecticut recognizes false light as a distinct tort addressing the overall misleading portrayal, not merely individual false statements. Dismissal is therefore unwarranted.

## C. Public Disclosure of Private Facts

The AC also plausibly states a claim for public disclosure of private facts. Under Connecticut law, liability attaches where a defendant gives publicity to private facts about an individual that are not of legitimate public concern and the disclosure would be highly offensive to a reasonable person. See *Goodrich*, 188 Conn. at 132–33.

Defendant disclosed and amplified sensitive, confidential information concerning Plaintiff and his minor children, including allegations and details drawn from sealed or confidential family-court proceedings and private family matters. Plaintiff alleges that these disclosures were not matters of legitimate public concern, were not necessary to any public debate, and served only to sensationalize private disputes, harm Plaintiff's relationship with his children, destroy his reputation, and inflict other harm.

The AC plausibly alleges that Defendant knew—or recklessly disregarded—that the information was private, sensitive, and inappropriate for public dissemination, particularly given the involvement of minor children and the confidential nature of family-court proceedings. The widespread dissemination of these private details to Defendant's large audience satisfies the

publicity requirement and supports the conclusion that the disclosures would be highly offensive to a reasonable person.

At this stage, Plaintiff is not required to prove the absence of public concern or the ultimate offensiveness of the disclosure; he need only plead facts making those conclusions plausible. He has done so. Defendant's motion improperly asks the Court to weigh competing narratives and defenses, which is not permitted on a Rule 12(b)(6) motion.

### D. Intentional Infliction of Emotional Distress

The AC plausibly states a claim for IIED. In *Craig v. Yale Univ. Sch. of Med.*, the court held that, to survive a motion to dismiss, a plaintiff need only "plead facts that plausibly support" the four elements of an IIED claim: (1) that the defendant intended to inflict emotional distress or knew, or should have known, that emotional distress was a likely result of her conduct; (2) that the conduct was extreme and outrageous; (3) that the conduct caused the plaintiff's distress; and (4) that the emotional distress was severe. 838 F. Supp. 2d 4, 9 (D. Conn. 2011). Plaintiff easily meets this threshold.

First, the AC plausibly alleges intent or recklessness. Defendant: published a sustained, highly inflammatory narrative accusing Plaintiff of sexual molestation and emotional abuse of his children, mistreatment of his ex-wife, manipulation of Connecticut courts and statutes, and other morally reprehensible misconduct; timed publication to coincide with a Connecticut contempt hearing to help her client (the ex-wife); refused to correct her misrepresentations after judicial findings exposing falsity were provided to her; and continued posting about Plaintiff after this

action was filed. These allegations support the reasonable inference that Defendant knew—or should have known—that her conduct would cause severe emotional distress.

Second, the alleged conduct is "extreme and outrageous." Connecticut courts recognize that conduct may satisfy this element where it exceeds "all bounds usually tolerated by decent society." *Appleton v. Board of Education*, 254 Conn. 205, 210, 757 A.2d 1059 (2000), citing to *Petyan v. Ellis*, 200 Conn. 243, 254 n.5 (1986), which in turn quotes the *Restatement (Second) of Torts*. Publicly branding a parent as a child sexual predator and emotional abuser; republishing and amplifying discredited criminal accusations, including those involving minor children; accusing an individual of corruption and colluding with authorities; disregarding contrary court findings; relying on discredited sources; and persisting after notice and litigation plausibly crosses that threshold. At the pleading stage, this conduct is sufficiently "outrageous."

Third, Plaintiff plausibly alleges causation. The AC ties Defendant's publications and continued amplification directly to Plaintiff's emotional suffering, including distress arising from reputational ruin, community ridicule and hatred, threats and hostile commentary generated by Defendant's associates and audience, and the compounded trauma of seeing false accusations about his children publicly disseminated.

Fourth, the AC plausibly alleges severe emotional distress. Plaintiff pleads substantial and ongoing emotional harm, including anxiety, humiliation, fear, and disruption of familial and personal life. In *Geysen v. Securitas Security Services USA, Inc.*, the Connecticut Supreme Court reaffirmed that at the pleading stage, a plaintiff is not required to offer evidence or prove the

claim, but must allege facts that, if proven, would satisfy the elements of the cause of action and render the claim legally sufficient. 322 Conn. 385, 398 (2016).

Defendant's motion again seeks to minimize the allegations and invites the Court to weigh facts and credibility. That is improper on a Rule 12(b)(6) motion. Accepting the well-pleaded allegations as true, Plaintiff has plausibly stated a claim for intentional infliction of emotional distress, and dismissal is unwarranted.

### E. Harassment

The AC plausibly states a claim for harassment based on Defendant's sustained course of conduct directed at Plaintiff. Connecticut law recognizes harassment where a defendant engages in a pattern of behavior directed at a specific individual that serves no legitimate purpose and is intended—or reasonably likely—to cause distress, alarm, or harm. Whether conduct rises to the level of harassment is a fact-intensive inquiry ill-suited for resolution on a motion to dismiss.

Here, Plaintiff alleges far more than isolated speech or a single publication. Defendant engaged in a continuing campaign targeting Plaintiff: publishing a lengthy article accusing him of grave misconduct; repeatedly promoting and amplifying those accusations across her platforms; hyperlinking and republishing defamatory material from other unreliable sources; and continuing to post about Plaintiff even after receiving notice of falsity and after this lawsuit was filed. Plaintiff further alleges that Defendant's continued postings after litigation was initiated generated additional hostile commentary, threats, and coordinated attacks by her followers, compounding the harm.

Critically, Plaintiff alleges that Defendant persisted in this conduct without any legitimate purpose. This is particularly true after judicial findings contradicted her narrative. At that point, Defendant's continued targeting certainly ceased to serve any plausible informational or advocacy function and instead became punitive and coercive—intended to pressure, intimidate, or emotionally harm Plaintiff.

At the pleading stage, Plaintiff is not required to prove intent, severity, or the ultimate unlawfulness of the conduct. He need only allege facts that, if proven, would permit a reasonable inference that Defendant engaged in a targeted, ongoing pattern of behavior directed at him that exceeded the bounds of lawful expression. The AC easily meets that threshold.

Defendant's motion improperly asks the Court to weigh motive, context, and justification— issues that must be resolved on a developed factual record. Accepting the well-pleaded allegations as true, Plaintiff has plausibly stated a claim for harassment.

## VII. VENUE IS PROPER IN THE DISTRICT OF CONNECTICUT

Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Connecticut. Plaintiff resides in Connecticut, the injuries were suffered here, and Defendant's publications were expressly directed at Connecticut residents, Connecticut courts, and Connecticut legal proceedings.

Connecticut has a strong sovereign interest in adjudicating claims where an out-of-state actor targets a Connecticut citizen and publicly attacks Connecticut courts, institutions, and authorities. That interest is at its apex where, as here, the challenged publications explicitly impugn the

integrity of Connecticut judges, the application of Connecticut law, and the conduct of

Connecticut family-court proceedings. See *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776

(1984) (recognizing a state's strong interest in redressing injuries suffered by its residents as a

result of out-of-state publications).

Plaintiff likewise has a compelling interest in obtaining relief in this forum. He resides in

Connecticut and suffered reputational, emotional, relational, and other harm here. Litigating in

the state provides efficient access to relevant witnesses, court records, and professionals involved

in the underlying proceedings, as well as Connecticut readers who Defendant aimed her

comments at. Courts have recognized that where the harm is centered in Connecticut, the forum

has a strong local interest in resolving the dispute. *Keeton*, 465 U.S. at 776 (1984). Defendant

identifies no hardship that would render venue in Connecticut unreasonable. Having deliberately

directed years of activity into this forum, Defendant cannot plausibly claim unfairness in being

required to defend herself here. Modern communication, electronic discovery, and remote

proceedings further minimize any burden. See *Burger King*, 471 U.S. at 474–77.

The interstate judicial system's interest in the efficient resolution of controversies also favors

venue in Connecticut. The relevant witnesses, documentary evidence, and injuries are located

here, and adjudicating the claims in this District avoids unnecessary duplication and inefficiency.

See *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 (1987).

Finally, exercising venue in Connecticut advances the shared interests of the several states in

deterring intentional torts committed across state lines and ensuring that plaintiffs may seek

redress where the harm is felt. *Keeton*, 465 U.S. at 776.

Accordingly, venue is proper in the District of Connecticut, and Defendant's venue-related arguments provide no basis for dismissal or transfer.

## VIII. CONCLUSION

Defendant's Motion to Dismiss is premised on a series of legal misstatements and factual omissions that cannot withstand scrutiny. The record before the Court—taken as it must be at this stage, in the light most favorable to Plaintiff—establishes personal jurisdiction under Connecticut's long-arm statute, satisfies constitutional due-process requirements, and pleads plausible claims for relief well in excess of Rule 12(b)(6)'s modest threshold.

Defendant purposefully availed herself of the privilege of conducting activities in Connecticut. She entered a paid professional relationship with a Connecticut resident; under § 52-59b(a)(1), that conduct alone is more than sufficient to confer jurisdiction. But Defendant's Connecticut-directed conduct was far more extensive than that. She inserted herself into active Connecticut family-court proceedings; communicated with Connecticut participants; cultivated a Connecticut audience through her One Mom's Battle enterprise; published content expressly aimed at Connecticut courts, statutes, judges, agencies, and citizens; and marketed services and merchandise to Connecticut residents. Connecticut was not an incidental forum—it was a focal point.

Even if it were not, jurisdiction independently exists under § 52-59b(a)(2) and (a)(3) for Plaintiff's non-defamation claims. Defendant committed tortious acts causing injury in Connecticut, engaged in a persistent course of Connecticut-directed conduct—including

operating and administering a Connecticut OMB chapter—and derives substantial revenue from interstate commerce through a nationwide/international, monetized advocacy platform. The statutory defamation carve-out does not insulate her from jurisdiction over these claims.

The exercise of jurisdiction also comports fully with due process. Defendant intentionally directed harmful conduct at Connecticut, knew the brunt of the injury would be felt here, and expressly aimed her publications at this forum. Under *Calder* and *Zippo*, her deliberate, interactive, and commercial online operations—combined with Connecticut-specific targeting— constitute purposeful availment. Requiring her to answer for that conduct in Connecticut offends neither fair play nor substantial justice.

On the merits, the Amended Complaint easily states plausible claims: Plaintiff pleads specific false statements of fact; explains why they are false; alleges fault well beyond negligence, including actual malice; and details substantial harm suffered in Connecticut. The AC further plausibly alleges false light, public disclosure of private facts, IIED, and harassment based on Defendant's sustained and escalating course of misconduct. At this stage, Plaintiff is not required to prove his case—only to plead facts that, if credited, state legally cognizable claims. He has done so.

Venue is likewise proper in this District. Plaintiff resides in Connecticut; the injuries occurred here; the publications targeted state residents and institutions; and the witnesses, records, and locus of harm are centered here. Connecticut has a compelling interest in adjudicating claims involving attacks on its courts and citizens, and Defendant identifies no countervailing hardship that would justify dismissal or transfer. In short, Defendant deliberately reached into

Connecticut, exploited its residents and institutions, and caused foreseeable harm here. Having done so, she cannot now evade accountability by recasting her conduct as passive, incidental, or jurisdictionally irrelevant.

For all of these reasons, Defendant's Motion to Dismiss should be denied in its entirety. In the alternative, should the Court perceive any remaining factual ambiguity concerning jurisdictional contacts uniquely within Defendant's control, Plaintiff respectfully requests limited jurisdictional discovery rather than dismissal.

Respectfully submitted,

/s/ *Christopher A. Ambrose*
Christopher A. Ambrose, *Pro Se*
153 Middle Beach Rd.
Madison, CT 06443
203.505.1889
ca0515@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2025, a copy of the foregoing was filed through the Court's CM/ECF system, which will automatically serve all parties.

/s/ *Christopher A. Ambrose*
Plaintiff, *Pro Se*